# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* Petition of Organized Crime and Corruption Reporting Project,<br><br>　　　Applicant,<br><br>For an Order Granting Leave to Issue Subpoenas to BSG Resources Ltd., Alvarez & Marsal Holdings, LLC, Cleary Gottlieb Steen and Hamilton LLP, the Marginalised Affected Property Owners Association, and EarthRights International for Taking of Discovery Pursuant to 28 U.S.C. § 1782 | Civil Action No. 23-172 |

**MEMORANDUM OF LAW IN SUPPORT OF THE PETITION OF ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT, PURSUANT TO 28 U.S.C. § 1782, FOR LEAVE TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

# TABLE OF CONTENTS

**JURISDICTION AND VENUE** ................................................................................. 1

**INTRODUCTION AND SUMMARY OF ARGUMENT** ......................................... 2

**FACTUAL BACKGROUND** .................................................................................... 5

   A.  Beny Steinmetz Sues OCCRP in Romanian Court Alleging that OCCRP's Reporting is False and Intrusive, and Seeks an Injunction and Damages ................................. 5

   B.  The Non-MAPO/ERI Respondents Have Repeatedly Turned to U.S. Courts to Assist Them in Resolving Their Dispute over Their Mining Interests in Guinea .............................. 7

   C.  The MAPO and ERI Respondents Seek this Court's Assistance for Use in Sierra Leone Litigation ........................................................................................................ 10

**NATURE OF INFORMATION AND DOCUMENTS SOUGHT** ........................... 11

**SECTION 1782 ENTITLES APPLICANT TO TAKE DISCOVERY FROM RESPONDENTS** .................................................................................................... 11

   A.  Applicant Satisfies Section 1782's Three Statutory Requirements ............................. 13

   B.  Respondents Reside or are Found in the Southern District of New York Because this Court Could Exercise General or Specific Jurisdiction over Them .............................. 14

   C.  Applicant Qualifies as an "Interested Person" and Seeks Discovery for Use in Proceedings Before a Foreign Tribunal ...................................................................... 20

   D.  The Discretionary Factors Favor Granting Discovery .................................................. 20

**CONCLUSION** ....................................................................................................... 28

Applicant Organized Crime and Corruption Reporting Project (OCCRP or Applicant) respectfully submits this Memorandum of Law and accompanying declaration of its principal, Paul Radu, in support of its application pursuant to 28 U.S.C. § 1782 to obtain discovery from Respondents BSG Resources Limited ("BSGR"), Alvarez & Marsal Holdings, LLC ("A&M"), Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), Marginalised Affected Property Owners Association ("MAPO") and EarthRights International ("ERI") (together, "Respondents"). Applicant seeks this discovery for use in filed and threatened civil proceedings in Romania in which Applicant is a defendant. Applicant respectfully requests oral argument at the Court's earliest convenience if this application is contested.

## I.  JURISDICTION AND VENUE

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 as this matter arises under 28 U.S.C. § 1782.  Respondents A&M, and Cleary have their principal places of business in Manhattan. This Court thus has general personal jurisdiction over each of these respondents. Respondent BSGR is a foreign corporation, and this discovery request arises out of its substantial contacts with this District.  Respondent MAPO is a foreign association, and this discovery request arises out of its substantial contacts with the District.  ERI is a Washington, D.C.-based corporation and this discovery request arises out of its substantial contacts with this District.  As set forth below, the Court therefore has specific jurisdiction over BSGR, MAPO and ERI for purposes of this discovery request.

Venue is proper under 28 U.S.C. § 1391(b)(2), as the documents at issue are located, and the events that gave rise to them took place, in this District, or section 1391(b)(3), as all Respondents are subject to personal jurisdiction here.

## II.  <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Applicant OCCRP provides an investigative reporting platform for a worldwide network of independent media centers and journalists focused on exposing crime and corruption and catalyzing positive change, including promoting policy reform and accountability for bad actors. Radu Decl. ¶ 2.  OCCRP has reported on the activities of Israeli billionaire Beny Steinmetz, and is in the process of writing a series of articles on matters related to Steinmetz's connections to multiple mining enterprises around the globe, including ties to mining-focused private equity firm Global Special Opportunities Ltd. ("GSOL"), BSGR's iron ore mining business in Guinea; its affiliated company Octea Limited's diamond mining business at the Koidu Mine in Sierra Leone, and Gabriel Resources and its plans for the Rosia Montana gold mine in Romania; as well as Steinmetz's now-dismissed lawsuit against George Soros in this District. Radu Decl. ¶ 6.  OCCRP has reached out to Steinmetz and individuals affiliated with him for comment in the process of reporting these articles. Radu Decl. ¶ 7.

As a result of OCCRP's reporting, in February 2023, Steinmetz sued OCCRP, its principal Paul Radu, and OCCRP's investigative journalism partner in Romania, RISE Project Romania, in a Romanian court, alleging that they violated Romanian defamation law in publishing what Steinmetz claims are false articles about him, as well as alleged violation of his privacy under the GDPR. Radu Decl. ¶ 8. Steinmetz seeks an injunction against further reporting and publication and deletion of the articles, as well as damages. *Id.*  That lawsuit was rejected by the Romanian court last month on technical grounds with leave to re-file; OCCRP believes that the lawsuit will be re-filed. Radu Decl. ¶ 11.  Steinmetz has more recently sent, through his lawyers, a cease-and-desist letter threatening further legal action should OCCRP continue its reporting efforts, which OCCRP intends to do. *Id.*  By this Section 1782 application, Applicant seeks discovery from Respondents for use in its defense in the Romanian proceedings, in order to demonstrate both that

the information in OCCRP's reporting is accurate and therefore not defamatory, and that the basis of OCCRP's use and publication of Steinmetz's information fits within the journalistic activities exemption to the GDPR in that it is being done for publication of journalistic material and that OCCRP reasonably believes that publication of the material would be in the public interest. Radu Decl. ¶¶ 13-14.

Although the subject matter of OCCRP's reporting (and therefore Steinmetz's allegations), is wide-ranging, Applicant seeks a carefully delimited set of documents that Respondents have already negotiated and agreed to produce in a separate Section 1782 proceeding in this District, minimizing any potential burden. (Case 1:21-mc-00681-RA). These are documents in Respondents' possession, custody, and/or control related to BSGR's and Octea's corporate structure and assets, including specific documents produced by BSGR and its administrator A&M in now-dismissed bankruptcy proceedings, which may also contain information relevant to the other matters about which OCCRP is reporting and that Steinmetz complains. Applicant believes that Respondents have possession, custody, and/or control of these documents due to their respective roles in BSGR's ongoing liquidation proceeding in Guernsey, disputes regarding enforcement of an arbitration award, as well as in connection with the separate Section 1782 proceeding.  A&M employees serve as bankruptcy administrators in the Guernsey proceeding, Cleary is counsel for Vale, S.A., which intervened in a related and now-voluntarily dismissed Chapter 15 proceeding in this District and is actively involved in litigation with BSGR to enforce a $2 billion arbitration award it received in 2019 in connection with a London arbitration. ERI is counsel for the MAPO, a community-based association of persons affected by the Koidu Mine activities, who are involved in litigation in Sierra Leone with the mine and has brought a pending Section 1782 proceeding in this District against the other Respondents and, as of the latest publicly

available status report, both MAPO and ERI are negotiating with BSGR to obtain the requested documents.

This application satisfies the three statutory requirements of Section 1782: Respondents reside or may be found in this District, the requested discovery is for use in foreign proceedings, and as a defendant in the Romanian proceeding and threatened further proceedings, Applicant is an "interested person" entitled to seek assistance from this Court under Section 1782.  Applicant seeks discovery from non-parties to the Romanian proceeding that falls squarely in the purview of the statute.

The discretionary factors courts consider in assessing a Section 1782 application weigh in favor of granting it: (1) Respondents are not named or contemplated parties in the Romanian proceeding; (2) the court in Romania will be receptive to Section 1782 assistance; (3) this application is not an attempt to circumvent foreign proof-gathering restrictions and is a good faith effort to obtain probative evidence; and (4) the discovery sought is specific, limited in scope, and not unduly intrusive or burdensome—indeed, Applicant seeks only documents that have already been negotiated and produced in response to MAPO's petition, themselves a subset of documents that were already produced in discovery in this District. *See Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015).

These documents are for use in litigation that Applicant believes will be refiled imminently. Accordingly, Applicant respectfully requests that the Court grant this application as expeditiously as possible.

### III.   FACTUAL BACKGROUND

**A. Steinmetz Sues OCCRP, Its Principal and Romanian Partner in a Romanian Court Alleging that OCCRP's Reporting is False and Intrusive, and Seeks an Injunction and Damages.**

This application arises out of a civil action filed by Steinmetz against OCCRP, its principal Paul Radu, and its Romanian investigative journalism partner RISE Project Romania. OCCRP's mission is to report on corrupt activities around the globe. Steinmetz has been a frequent subject of its articles due to his connection to various mining operations in Africa, Europe and South America, including the Koidu Mine in Sierra Leone, which he indirectly controls through BSGR and its subsidiary, Octea Limited, and other intermediate companies. Radu Decl. ¶ 6. The choice of forum does not appear accidental. Romania is a hostile jurisdiction to the press, and defamation cases against journalistic outlets in Romanian courts are frequently used by powerful individuals as a pressure tactic.[1]

Steinmetz's lawsuit in Romania alleges that Applicant defamed him, including with respect to his connections to BSGR and Octea, and that OCCRP's continued reporting on his mining activities violates his privacy.[2] Radu Decl. ¶ 8.  He seeks injunctive relief in the form of a ban on continued reporting on him by Applicant as well as deletion of existing reporting that has been published online. *Id.*  The articles that Steinmetz alleges are defamatory include articles about how

---

[1] *See, e.g.*, U.S. Embassy in Romania, 2022 Country Reports on Human Rights Practices: Romania (Mar. 21, 2023), *available at* https://ro.usembassy.gov/2022-country-reports-on-human-rights-practices-romania/, International Press Institute, Romania: Independent investigation needed into harassment campaign against journalist Emilia Șercan (Apr. 14, 2022); Adrian Mogos, Balkan Insight, Romania's Hard Pressed Journalists Await EU Rescue from SLAPPS (Nov. 18, 2022), *available at* https://balkaninsight.com/2022/11/18/romanias-hard-pressed-journalists-await-eu-rescue-from-slapps/ (last visited May 8, 2023).

[2] *See* Ioulia Staniou, CONTEXT, Billionaire Steinmetz Sued OCCRP and RISE Project Romania and Demanded the Deletion and Censorship of the Investigations About Him (April 24, 2023), *available at* https://context.ro/billionaire-steinmetz-sued-occrp-and-rise-project-romania-and-demanded-the-deletion-and-censorship-of-the-investigations-about-him/ (last visited May 8, 2023).

the Panama Papers show that Steinmetz is the "ultimate beneficiary" of mining interests including BSGR in Sierra Leone. Radu Decl. ¶ 8, Ex. 2.  OCCRP is in the process of reporting on other matters including his now-dismissed case against George Soros in this District, his or his companies' relationship with GSOL and the individuals tied to this company (notably Sabby Mionis, Marcos Camhis and Ioannis Procopis); the company Gabriel Resources and its plans for the Rosia Montana gold mine in Romania; BSGR's iron ore mining business in Guinea; the company Octea Limited's (part of the Octea Group) diamond mining business in Sierra Leone; and the nature of his own ties with BSGR. Radu Decl. ¶ 6.

These matters, which relate to allegations of financial wrongdoing, are of notable public interest (and therefore satisfy a GDPR exemption) because of allegations of corruption and other financial misbehavior, environmental harm and human rights. Radu Decl. ¶ 6.  Steinmetz recently lost his appeal against a bribery conviction in Switzerland over how BSGR obtained iron ore licenses in Guinea.[3]  The activities of BSGR subsidiary Octea Limited in Sierra Leone have sparked two major protests in that country, in which at least four people were shot dead, and prompted an official inquiry.[4]  In Romania, discontent over the potential environmental consequences of the Rosia Montana mine—as well as concerns over population displacement, and suspected corruption—sparked nationwide protests in 2013, the biggest in that country since the fall of Communism.[5]

---

[3] *See* Reuters, Beny Steinmetz to Appeal Swiss Court's Corruption Ruling – Statement (Apr. 4, 2023), https://www.usnews.com/news/world/articles/2023-04-04/beny-steinmetz-to-appeal-swiss-courts-corruption-ruling-statement

[4] *See* BBC, Sierra Leone Koidu Mine: Foreigners 'Holed Up' After Clashes (Dec. 19, 2012), *available at* https://www.bbc.com/news/world-africa-20781940 (last visited May 9, 2023).

[5] *See* Luiza Ilie, Reuters, Romanians Protest Against Gold Mine Plan (Jan. 28, 2012), *available at* https://www.reuters.com/article/us-romania-protests-rosiamontana-idUKTRE80R0QJ20120128 (last visited May 9, 2023).

In response to continued reporting activities by OCCRP, a law firm purporting to act on Steinmetz's behalf sent a cease-and-desist letter to OCCRP and Radu on April 4, 2023 threatening further legal action. Radu Decl. ¶ 11, Ex. 3.

On April 28, 2023, the Romanian court rejected Steinmetz's filing because of a minor procedural defect. Radu Decl. ¶ 10.  Applicant believes that Steinmetz will correct the defect and re-file the complaint. Radu Decl. ¶ 11.

### B. The Non-MAPO/ERI Respondents Have Repeatedly Turned to U.S. Courts to Assist Them in Resolving Their Dispute over Their Mining Interests in Guinea.

BSGR and Cleary's client, Vale S.A., have been embroiled in a dispute over the Simandou Iron Ore concession in Guinea for much of the last decade. Mem. of Law in Supp. of Pet. For Recognition and Enforcement of a Foreign Arbitration Award 2-5, *Vale S.A. v. BSG Res. Ltd*., 1:19-cv-03619 (S.D.N.Y. April 24, 2019) (Dkt. 5). Vale accused BSGR of fraudulently inducing it to invest in the Simandou venture and illegally obtaining the mining rights through a complex bribery scheme. *Id.* at 1. Courts in Switzerland and the United States have since convicted Steinmetz and other BSGR employees of bribery, corruption and obstruction of justice.[6]  The Swiss conviction was recently upheld on appeal.[7]

In 2014, Vale filed a claim against BSGR in the London Court of International Arbitration.

---

[6] *See, e.g.*, Press Release, Tribunal Pénal, République et Canton de Genève, Procédure pénale P/12914/13 dirigée contre Benjamin STEINMETZ et deux autres prévenus (Jan. 22, 2021), https://justice.ge.ch/en/node/2242; Award ¶ 292, *Vale S.A. v. BSG Res. Ltd.*, LCIA Case No. 142683 (London Ct. of Int'l Arb. 2019) ("Arbitration Award").

[7] *See* Reuters, Beny Steinmetz to Appeal Swiss Court's Corruption Ruling – Statement (Apr. 4, 2023), https://www.usnews.com/news/world/articles/2023-04-04/beny-steinmetz-to-appeal-swiss-courts-corruption-ruling-statement

Both Vale and BSGR have used Section 1782 to seek assistance from U.S. courts in conducting discovery for the merits and enforcement of the London arbitration.[8] One of these applications was voluntarily dismissed and the other was granted.

In 2017, BSGR and two of its subsidiaries filed a complaint in this District seeking tens of billions of dollars in damages from George Soros and the Open Society Foundation (the "Soros litigation"), alleging that Soros was responsible for the revocation of BSGR's Guinean mining license. Compl., *BSG Res. (Guinea) Ltd. v. Soros*, No. 17-cv-02726 (S.D.N.Y. Apr. 14, 2017) (Dkt. 1). BSGR claimed at the time that its interest in the Soros litigation was its most valuable asset in the world. Decl. of Malcolm Cohen ¶ 51, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. Jun. 21, 2019) (Dkt. 24).

BSGR put itself under bankruptcy administration in Guernsey in February of 2018. *See* Statement Identifying Foreign Proceedings Pursuant to 11 U.S.C. § 1515(c) ¶¶ 32-34, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. Jun. 3, 2019) (Dkt. 3). According to Vale, BSGR's bankruptcy aimed to undermine Vale's ability to enforce any potential arbitral award. Vale S.A.'s Initial Obj. to the Joint Administrators' Verified Pet. for Recognition of Foreign Proceedings under Chapter 15 of the U.S. Bankruptcy Code ¶¶ 6, 15, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. Jul. 10, 2019) (Dkt. 29) ("Bankr. Obj.").

In April of 2019, the London Court of International Arbitration awarded Vale $2 billion. Arbitration Award ¶ 1005. Vale filed a petition to recognize and enforce its award against BSGR in this District, which the court granted. Judgment, *Vale S.A. v. BSG Res. Ltd.*, 1:19-cv-03619

---

[8] *See, e.g.*, Mem. of Law in Supp. Of Pet. For an Order Pursuant to 28 U.S.C. § 1782 Compelling Disc. In Aid of a Foreign Judicial Proceeding, *In re Application of BSG Res. Ltd.*, No. 1:16-mc-02552 (D.D.C. Dec. 21, 2016) (Dkt. 7-1) (voluntarily dismissed, *see* Dkt. No. 33); Mem. of Law in Supp. of *Ex Parte* Appl. For an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings, *In re Application of Vale S.A.*, No. 1:20-mc-00199 (S.D.N.Y. Apr. 24, 2020) (Dkt. 2) (granted at Dkt. 45).

(S.D.N.Y. Mar. 5, 2020) (Dkt. 51). Vale filed a motion to compel production of documents from Steinmetz, alleging that he was an alter ego of BSGR, which the court granted upon a finding that there was *prima facie* evidence to support this contention. Order on Motion to Compel, *Vale S.A. v. BSG Res. Ltd*., 1:19-cv-03619 (S.D.N.Y. Oct. 15, 2021) (Dkt. 84).

Shortly after its loss in the arbitration, BSGR filed a petition pursuant to Chapter 15 of the United States Bankruptcy Code for recognition of the Guernsey bankruptcy in this District. Pet. for Recognition of a Foreign Proceeding, *In re BSG Res. Ltd*., No. 19-11845 (Bankr. S.D.N.Y. Jun. 3, 2019) (Dkt. 1). The petition aimed to ensure that the Guernsey bankruptcy administrators maintained control over BSGR's claims in the then-pending Soros litigation, and that U.S. courts would give the administrators control over BSGR's assets in the United States and thereby prevent Vale from enforcing its judgment against those assets. *See* Letter to All Known and Contingent Creditors from William Callewaert 4, *In re BSG Res. Ltd*., No. 19-11845 (Bankr. S.D.N.Y. Mar. 5, 2020) (Dkt. 98-1). Vale intervened to challenge BSGR's Chapter 15 petition in New York, arguing that the bankruptcy in Guernsey was illegitimate. See Bankr. Obj. at ¶ 1. Vale alleged that "questionable financial and legal dealings have been the hallmark of the Guernsey [bankruptcy] Administration," which, along with the related New York proceedings, aimed to "defraud a creditor" in "bad faith." *Id*. at ¶¶ 5, 15. Cleary acted as Vale's counsel in the New York bankruptcy and is its counsel in the arbitration enforcement litigation.

On September 8, 2020, the court in Guernsey discharged the bankruptcy administrators and appointed three A&M employees as new administrators. *See* Letter to Judge Lane from Steven J. Reisman, *In re BSG Res. Ltd*., No. 19-11845 (Bankr. S.D.N.Y. Sept. 14, 2020) (Dkt. 122). The A&M administrators took over their predecessors' role in the New York bankruptcy before its dismissal. The Guernsey proceeding, to the best of petitioner's knowledge, is ongoing. In light of

the termination of the Soros litigation, however, the Bankruptcy court dismissed the Chapter 15 proceeding on its own motion in June 2022. *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. Jul. 10, 2019) (Dkt. 137).

On October 27, 2021, after the parties had engaged in discovery, the Soros litigation was voluntarily dismissed with prejudice. *See* Order, *BSG Res. (Guinea) Ltd. v. Soros*, No. 17-cv-02726 (S.D.N.Y. Jan. 25, 2021) (Dkt. 193) (reserving decision on motion until discovery is completed); Stipulation and Dismissal (Dkt. 317).

### C.  The MAPO and ERI Respondents Seek this Court's Assistance for Use in Sierra Leone Litigation.

In August of 2021, MAPO filed a Section 1782 petition in this District seeking certain documents related to BSGR's operation of the Koidu Mine that had been produced in the bankruptcy for use in litigation it is involved in in Sierra Leone. *See* Petition, 1:21-mc-00681-RA (S.D.N.Y. Dkt. 1).  Although BSGR, A&M and Cleary were all named as respondents, BSGR (through its administrator A&M) agreed to provide the materials shortly after the petition was filed and MAPO therefore withdrew its application against A&M and requested a stay. *See* Order, 1:21-mc-00681-RA (S.D.N.Y. September 27, 2021) (Dkt. 10); Order 1:21-mc-00681-RA (S.D.N.Y. October 12, 2021) (Dkt. 12).  ERI, although acting as counsel to MAPO, has its own interest in the litigation. It is an advocacy organization that files "accountability cases against corporations and governments and defend earth rights activists against civil and criminal liability."[9]  It specifically markets its services preparing and filing Section 1782 applications to "victims of human rights abuses."[10]  MAPO and ERI are currently engaged in a document review process in

---

[9] *See* https://earthrights.org/litigation-and-legal-advocacy/ (last visited May 22, 2023).

[10] *See* https://earthrights.org/litigation-and-legal-advocacy/legal-strategies/foreign-legal-assistance/ (last visited May 22, 2023).

Sierra Leone with BSGR to resolve that application. *See* Letter, 1:21-mc-00681-RA (S.D.N.Y. Jan. 9, 2023 (Dkt. 25).

### IV.   NATURE OF INFORMATION AND DOCUMENTS SOUGHT

Applicant seeks only those documents already produced or that will be produced in the MAPO proceeding, which Applicant believes include information regarding BSGR's corporate structure and finances, relationship with Octea Limited, Octea Limited's corporate structure and finances, and the operations of the Koidu Mine, as listed in the Request for Production of Documents, attached as Exhibit B to this application.  Based on Applicant's reporting, Applicant also has reason to believe that these documents will contain information relevant to Steinmetz' connections to GSOL. Radu Decl. ¶ 19. Applicant also requests that the Court order that Respondents cooperate as necessary – depending on the nature of the documents produced – in verifying the authenticity of the documents to facilitate their submission as evidence in the Romanian case. *See, e.g., Amgen Inc. v. Hill*, No. 2:14-mc-00908-DN-EJF, 2015 WL 1401237, at *1-2 (D. Utah March 25, 2015) (ordering documents produced under Section 1782 to be "accompanied by a signed certification verifying the authenticity of the documents").

Applicant requests a carefully delimited set of identifiable documents, which had been previously produced in the bankruptcy and which – according to documents filed by Cleary on behalf of its client Vale in the New York proceedings – are not and should not be subject to any confidentiality agreement, and as further limited by documents negotiated between MAPO and BSGR. *See* Opp'n to the Mot. of the Joint Administrators for an Order (I) Affirming Confidentiality Designations and (II) Modifying the Court's Confidentiality Stipulation and Req. for Sanctions 13, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. May 26, 2020) (Dkt. 97). Filings in the MAPO case further indicate that MAPO's and ERI's review has already included

consideration of potential confidentiality issues. *See* Letter, 1:21-mc-00681-RA (S.D.N.Y. Jan. 9, 2023 (Dkt. 25). Respondents Cleary and A&M's engagement in the Guernsey and their involvement in the New York bankruptcies gives them possession of these documents, and this information will certainly assist the Romanian court in resolving the pending case.

Respondents are likely to have access to this information. While BSGR and its directors have sought to evade their discovery obligations, they nonetheless produced some discovery in the New York bankruptcy and are in the process of producing information to MAPO through its counsel, ERI. As parties to the bankruptcy, Vale (and its attorneys at Cleary), BSGR, and the A&M administrators have possession of this discovery. A&M also independently has access to this information through its role as bankruptcy administrator. Likewise, BSGR has access to this information through the operation of its business.

The disputes in the bankruptcy centered around two issues: whether BSGR's "center of main interest" is in Guernsey and whether BSGR's "bad faith in the conduct of its business and in pursuing recognition warrants the denial of [bankruptcy] relief." Bankr. Obj. at ¶¶ 1, 9. The "center of main interest" analysis considers the location of BSGR's property and liquid assets and BSGR's corporate structure, including the location "from where the debtor's activities are directed and controlled" and "the location of employees and managers." *Id*. at ¶¶ 7-11 (internal quotation marks omitted). The bad faith exception requires evidence of "(a) the redistribution of assets in the face of an imminent adverse ruling; (b) attempts at controlling a foreign representative or other independent fiduciary; (c) behavior resulting in the deprivation of the resources needed for a foreign representative to fulfill his/her duties; and/or (d) the orchestration of a chapter 15 case to deprive . . . [a] creditor of much or all of the fruits of its judgments." *Id*. at ¶ 14 (internal quotations omitted). BSGR has produced discovery in the bankruptcy on both issues.

Both of these categories of information are directly relevant to the Romanian case. Information about BSGR's corporate structure, assets, and deceptive business practices will establish that OCCRP's reporting on Steinmetz's involvement in BSGR and the Koidu Mine operation was accurate, thus defeating claims of defamation raised in the Romanian lawsuit. Radu Decl. ¶ 13-14.  As part of its defense to the defamation claims, Applicant needs to establish the accuracy of its reporting regarding the degree of Steinmetz's involvement in and knowledge of the operations of BSGR, Octea and Koidu Limited, which manages the Koidu Mine.  The identities of the true owners and managers of Koidu Limited are not evident, given BSGR's track record of using its multi-jurisdictional structure to hide legally significant information. *Id.*

BSGR produced information about the ownership of its assets and all claims thereto to prove that its "center of main interest" is in Guernsey.  This discovery likely includes information about the ownership and management of the Koidu Mine, one of BSGR's most valuable assets, including evidence about how decisions were made regarding the Koidu Mine's operation.  It likely also includes analysis of any risk to that income stream, including the costs and benefits of environmental or relocation decisions.  This information is directly relevant to the Romanian case. From this information, Applicant will be able to prove that its reporting was and continues to be accurate and may also glean information relevant to the defense of Steinmetz's GDPR claim against it.

The legal proceedings in New York and Guernsey have established that BSGR is operated strategically for the benefit of Steinmetz and that the operating components such as Koidu Limited and its co-defendants in the Sierra Leone lawsuits are manipulated to enable Steinmetz to maximize profit, evade creditors and hide information from tribunals.  Applicant expects that the

discovery sought in this application will shed light on the extent to which Koidu Limited, Octea

Limited, and other affiliates are operated as a single entity as part of this overall scheme.

## V.   SECTION 1782 ENTITLES APPLICANT TO TAKE DISCOVERY FROM RESPONDENTS

Section 1782 permits district courts to order discovery in the United States in response to

requests for assistance from foreign litigants.  The statute has been given "increasingly broad

applicability" over the years. *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80

(2d Cir. 2012) (internal quotation marks omitted). In order to obtain discovery under Section 1782,

an applicant must first meet three statutory requirements.  Once these statutory requirements are

met, the court may consider several discretionary factors. *Mees v. Buiter*, 793 F.3d 291, 297-98

(2d Cir. 2015).  Here, OCCRP satisfies the statutory requirements, and the discretionary factors

weigh in favor of granting discovery.  The discovery OCCRP requests is the type that Congress

contemplated when passing 28 U.S.C. § 1782. This application therefore should be granted.

### A.  Applicant Satisfies Section 1782's Three Statutory Requirements.

A district court possesses jurisdiction to grant a Section 1782 application where:

> "(1) the person from whom discovery is sought resides (or is found)
> in the district of the district court to which the application is made, (2)
> the discovery is for use in a foreign proceeding before a foreign [or
> international] tribunal, and (3) the application is made by a foreign or
> international tribunal or any interested person."

*Mees*, 793 F.3d at 297 (quoting *Brandi-Dohrn*, 673 F.3d at 80) (alteration added by *Mees*).

Applicant satisfies all three requirements: Respondents reside or are found in the Southern District

of New York, the documents are for use in an ongoing proceeding in Romania[11], and as a party to

the foreign proceeding, Applicant is the paradigmatic interested person.

---

[11] Use of the documents in a potential criminal proceeding as requested by Steinmetz in Romania also
qualifies under the statute. *See In re Ex Parte Application of Abdulrahman Mutabagani*, 2023 WL 2812621

**B. Respondents Reside or are Found in the Southern District of New York Because this Court Could Exercise General or Specific Jurisdiction over Them.**

The Second Circuit has determined that "the statutory scope of 'found' extends to the limits of personal jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d 520, 527 (2d Cir. 2019). Accordingly, each respondent "resides or is found" where a court could exercise general or specific personal jurisdiction over it. *Id.* at 527-28.

Respondent Cleary is a limited liability partnership (LLP) that maintains its principal place of business at One Liberty Plaza, New York City.[12]  Respondent A&M is a limited liability corporation (LLC) that maintains its principal places of business at 600 Madison Avenue, New York City.[13]  Both Cleary and A&M reside in New York, where they maintain their principal places of business, so this court could exercise general personal jurisdiction over them. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (holding corporations reside where they are incorporated or have their principal place of business); *Hartford Fire Ins. Co. v. Maersk Line*, No. 18-cv-121(PKC), 2019 WL 4450639, at *15-16 (S.D.N.Y. Sep. 17, 2019) (applying *Daimler's* test to an LLC); *Finn v. Great Plains Lending, LLC*, No. CV 15-4658, 2016 WL 705242, at *3 n.3 (E.D. Pa. Feb. 23, 2016) (same); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1139 n.14 (S.D. Cal. 2018) (adopting "*Daimler*'s two-part paradigmatic location approach for general jurisdiction" for an LLP); *Magna Powertrain De*

---

(S.D.N.Y. Apr. 6, 2023) ("The proceeding must be 'within reasonable contemplation,' but need not be 'pending or even imminent in order to meet the 'for use' requirement." (*citing IJK Palm LLC v. Anholt Servs. USA, Inc.*, 33 F.4th 669 (2d Cir. 2022)).

[12] Cleary Gottlieb Steen & Hamilton, New York Department of State, Corporation & Business Entity Database Search, https://apps.dos.ny.gov/publicInquiry/EntityDisplay (last visited April 21, 2023).

[13] Alvarez & Marsal Holdings, LLC, New York Department of State, Corporation & Business Entity Database Search, https://apps.dos.ny.gov/publicInquiry/EntityDisplay (last visited April 21, 2023); *see also* A&M Forbes profile, identifying New York as its headquarters, *available at* https://www.forbes.com/companies/alvarez-marsal/?sh=51372e923e08 (last visited April 21, 2023).

*Mex. S.A. De C.V. v. Momentive Performance Materials USA LLC*, 192 F. Supp. 3d 824, 828

(E.D. Mich. 2016) (explaining "personal jurisdiction rules governing corporations generally have

been applied to limited liability companies as well"); *Mitchell v. Fairfield Nursing & Rehab. Ctr.,*

*LLC*, No. 2:15-cv- 00188-MHH, 2016 WL 1365586, at *6 (N.D. Ala. Apr. 6, 2016) (collecting

cases).

Respondent BSGR is a foreign corporation.  It is incorporated and has its principal place

of business in Guernsey.  BSGR is "found in" New York because (as explained further below) the

Court may exercise specific personal jurisdiction over it for the purposes of this discovery request.

Respondent ERI is a foreign corporation.  It is incorporated and has its principal place of business

in Washington, D.C.  MAPO and ERI are "found in" New York because (as explained further

below) the Court may exercise specific personal jurisdiction over them for purposes of this

discovery request.

"[W]hether a forum State may assert specific jurisdiction over a nonresident defendant

focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*,

571 U.S. 277, 283-84 (2014) (internal quotation marks omitted).  In a Section 1782 discovery

request, courts must (1) "decide if the individual or entity has 'purposefully directed his activities

at the forum and the litigation arises out of or relates to those activities;''' and (2) "'then decide

whether exercising jurisdiction for the purposes of the order would comport with fair play and

substantial justice.'" *In re del Valle Ruiz*, 939 F.3d at 528-29 (quoting *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 472 (1985) and *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 137 (2d

Cir. 2014)).

Where a Section 1782 request seeks documents for use in a foreign lawsuit, "the nonparty's contacts with the forum [must] go to the actual discovery sought rather than the underlying cause of action." *Id.* at 530. If the "discovery material sought proximately resulted from the respondent's forum contacts, that would be sufficient to establish specific jurisdiction for ordering discovery." *Id.* But where "contacts are broader and more significant, a petitioner need demonstrate only that the evidence sought would not be available but for the respondent's forum contacts." *Id.* And as the Supreme Court recently clarified in *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026-27 (2021), courts also have specific personal jurisdiction where the action is *related to* the defendant's contact with the forum, even if the action did not *arise from* the contacts. A court may maintain specific jurisdiction even where only a single transaction occurred in the jurisdiction, so long as the requested discovery arises out of that transaction. *In re Kuwait Ports Auth.*, No. 1:20-MC-00046-ALC, 2021 WL 590999, at *7 (S.D.N.Y. Dec. 13, 2021) (finding specific jurisdiction when there was an "articulable nexus or substantial relationship between the transaction" and the requested discovery from a decade-old E*Trade funds transfer that took place "when E*Trade was headquartered in New York.").

This discovery request "arises out of," or at least relates to, BSGR's, MAPO's and ERI's New York activities. The documents are only present in New York because BSGR chose New York as the forum for its bankruptcy petition. And some of the documents exist solely because BSGR and the bankruptcy administrators created them as reports to the bankruptcy court or because the parties participated in the discovery process related to the bankruptcy, including by producing documents or engaging in depositions.

There is no question that BSGR has purposefully directed its acts at this forum, intending to avail itself of the laws of New York. BSGR's ten billion dollar interest in the Soros litigation

was located in New York because BSGR elected to file its claims in New York, not in Guinea, where the alleged incidents took place. BSGR chose to further make use of the U.S. court system by filing a Chapter 15 application in New York to protect its interest in the Soros litigation, and to seek discovery for a foreign arbitration, which in turn led MAPO and its advocacy group counsel ERI to choose New York as the location for MAPO's own Section 1782 application. BSGR's other contacts with New York are extensive, including maintaining bank accounts in New York and routinely using U.S. wires. Mem. of Law in Supp. of Pet. for Recognition and Enforcement of a Foreign Arbitration Award 18-19, *Vale S.A. v. BSG Res. Ltd.*, 1:19-cv-03619 (S.D.N.Y. April 24, 2019) (Dkt. 5). Indeed, Vale's enforcement of the foreign arbitration award was properly brought in this district in part because of BSGR's contact with New York. *Id.* at 18-20. MAPO and ERI have similarly availed themselves of the forum by filing a Section 1782 petition in order to aid MAPO's litigation efforts in Sierra Leone. That negotiation remains ongoing.

The "nature and extent of the defendant's relationship to the forum State" makes the maintenance of this suit fair and reasonable. *Ford Motor Co.*, 141 S. Ct. at 1024 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1779 (2017)). BSGR's repeated use of New York courts is not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U. S. 770, 774 (1984). After repeatedly using the American court system to extract benefits when it sees fit, including asking U.S. courts to assist it in conducting discovery for the London arbitration, it is only just that BSGR is subject to the same discovery obligations. *See In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1037-38 (N.D. Cal. 2016) (noting that respondent's "deliberate choice of this forum for its litigation" helped establish that respondent was "found in" the district). Indeed, Applicant only seeks documents that BSGR

already produced in the New York bankruptcy case that it initiated, as limited by further negotiation with ERI, and identified in Exhibit B.  Similarly, making use of the New York banking system is a purposeful availment of the benefits of U.S. laws, which ought to subject a party to jurisdiction. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (KBF), 2013 WL 1155576, at \*14 (S.D.N.Y. Mar. 13, 2013) (holding that "repeated use of a correspondent account in New York . . . show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of the United States") (internal citations omitted).

Beyond being purposeful, BSGR's contacts with New York are broad and significant. This is not a case of an entity that is spread across continents, with New York connections constituting only a small portion of its assets. BSGR's administrators claimed that its ten billion dollar interest in the Soros litigation was its "most valuable asset anywhere in the world." Decl. of Malcolm Cohen ¶ 51, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. June 21, 2019) (Dkt. 24). BSGR's contacts with New York are so pervasive, and of such a legal nature that BSGR cannot plausibly argue that it could not "anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Accordingly, this Court can exercise specific personal jurisdiction over BSGR, MAPO and ERI for the purposes of the discovery request, so BSGR and ERI are found in New York for purposes of Section 1782.[14]

---

[14] That MAPO and ERI have obtained documents from BSGR as a party-opponent and may only have temporary possession of the sought documents is not a bar to granting a Section 1782 application. *See In re Biomet Orthopaedics Switzerland GmBH*, 742 Fed. Appx. 690, 695 (3d. Cir. 2018) (Section 1782 "can . . . reach documents temporarily held by a litigation opponent" and "applies to documents only temporarily present in the jurisdiction for the purpose of discovery in another case" because Section 1782 "contains 'no express mandate to consider the principal-agent relationship, or whether the documents being held by the subpoenaed party belong to a foreign party.'" (*citing Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018)).

### C. Applicant Qualifies as an "Interested Person" and Seeks Discovery for Use in Proceedings Before a Foreign Tribunal.

As a defendant in the Romanian proceeding, OCCRP is clearly an "interested person" person" within the meaning of Section 1782. *See Intel Corp. v. Advanced Micro Devices*, 542 U.S. 241, 256 (2004) ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782 . . . ."); *accord In re Application of 000 Promneftstroy*, 134 F. Supp. 3d 789, 791 (S.D.N.Y. 2015).

Applicant seeks discovery for use in the lawsuit filed against it before a Romanian court and further threatened foreign proceedings.  The discovery contemplated by this request is "for use" in the Romanian proceedings because it would provide information that Applicant could submit to the Romanian court and that is beneficial to the resolution of the issues in dispute. *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).  In assessing whether discovery is "for use" in a foreign proceeding, a court may not consider whether the information sought would be discoverable or admissible in the foreign proceeding. *Brandi-Dohrn*, 673 F.3d at 82 ("Accordingly, as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application."). Instead, it considers "the practical ability of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d at 131.  As a litigant in the Romanian case, Applicant has the ability to place this evidence before the Romanian court. Applicant thus satisfies the three statutory requirements.

### D.  The Discretionary Factors Favor Granting Discovery.

Once the statutory requirements are met, "a district court may grant discovery under Section 1782 in its discretion." *Mees*, 793 F.3d at 297.  This discretion "must be exercised in light

of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 297-98 (internal quotation marks omitted). Four factors may guide a district court's exercise of discretion to grant discovery under Section 1782 (the "*Intel* factors"):

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent";

> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome."

*Id.* at 298 (quoting *Intel*, 542 U.S. at 264-65).

In this case, all four *Intel* factors weigh in favor of granting Section 1782 discovery. Nonetheless, a failure to meet any of them does not preclude discovery. *See, e.g.*, *Intel*, 542 U.S. at 246, 264, 266 (remanding for further analysis even though respondent was a party to the underlying case); *accord Gorsoan Ltd. v. Bullock*, 652 Fed. App'x 7, 9 (2d Cir. 2016) (noting that "participation in the foreign proceedings does not automatically foreclose § 1782 aid").

### a.  Respondents are not parties to the proceedings in Romania and are not subject to the jurisdiction of Romanian courts.

The need for discovery is more apparent where the person from whom discovery is sought is not a participant in the matter abroad. *See Intel*, 542 U.S. at 264. Respondents are not parties to the proceedings in Romania, and are located in the United States, Sierra Leone and Guernsey. The Romanian court could not, as a matter of law, require Respondents to produce these documents, because they are outside of the court's jurisdiction, Radu Decl. ¶ 21; accordingly, this factor favors discovery.

It is unknown whether the plaintiff in the Romanian proceeding, Steinmetz, has access to much of the requested discovery. Apart from legal corporate formalities, Steinmetz in his Romanian complaint denies having control over BSGR. The deposition transcripts and some other reports were created specifically for the bankruptcy, and would only be in the possession of the parties to the bankruptcy. Likewise, BSGR, and not necessarily its owners, would hold BSGR's analysis of its business operations, assets, loans, or environmental or resettlement issues and its board meeting minutes.

Even if the Romanian court or the Romanian defendants could theoretically request the discovery from Steinmetz, there is no requirement to exhaust one's remedies in the foreign court before submitting a request under Section 1782; "a 'quasi-exhaustion requirement,'" the Second Circuit has held, "finds no support in the plain language of the statute and runs counter to its express purposes." *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997); *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992). The Court should still grant discovery even if the documents were available in Romania, because it is unlikely that any party would actually produce the discovery in Romania, given Steinmetz's past practices of evading or delaying discovery obligations at every turn.[15] Applicant has its greatest, and possibly only, chance of receiving the documents here, where BSGR already produced them to protect its stake in the Soros litigation and has agreed to produce them to MAPO and ERI in response to MAPO's Section 1782 application.

---

[15] *See, e.g.*, Diamond Naga Siu, Soros Says Steinmetz Skirting Discovery Warrants Sanctions, LAW360 (Sept. 7, 2021), *available at* https://www.law360.com/articles/1419204/soros-says-steinmetz-skirting-discovery-warrants-sanctions (last visited May 18, 2023); J. Edward Moreno, Steinmetz Ordered to Honor Year-Old Discovery Request, LAW360 (Oct. 15, 2021), *available at* https://www.law360.com/articles/1431586/steinmetz-ordered-to-honor-year-old-discovery-request (last visited May 18, 2023).

**2. The nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the Romanian court to U.S. federal court assistance favors granting this application.**

There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). In order to deny discovery because of a lack of receptiveness, a court must find "authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100.

Here, Applicant is a defendant in a civil action for damages and injunctive relief, and has fully and accurately disclosed the nature of the proceedings. Applicant believes that Steinmetz will correct the procedural deficiency and will re-file the action; lawyers acting on his behalf have already threatened additional litigation. Radu Decl. ¶¶ 10-11. Once re-filed, Applicant may offer discovery from Respondents as evidence in their defense against Steinmetz' claims. *Id.* at ¶¶ 14, 20. Information that is in the hands of Respondents is directly relevant to the Romanian case and will be important for resolving the dispute around the accuracy of Applicant's reporting on Steinmetz' relationship with BSGR, knowledge and control of BSGR's operation of the Koidu Mine, Steinmetz's knowledge of and relationship with GSOL and Octea Limited, as well as demonstrating OCCRP's eligibility for the journalistic exception to the GDPR claims. The Romanian court has the authority to accept evidence produced through Section 1782 discovery. Radu Decl. ¶ 20; *see In re B&C KB Holding GmbH*, No. 22-MC-00180, 2023 L 1777326, at *5 (S.D.N.Y. Feb. 6, 2023) ("As courts in this Circuit have made clear, an applicant need make only a '*de minimus* showing that the information sought is 'for use'' in a reasonably contemplated criminal foreign proceeding," which was

23

satisfied by submission of a declaration by counsel detailing the relevancy of the requested information to the foreign criminal proceeding (internal citation omitted)).

This factor favors granting discovery.

### 3. This application is not an attempt to circumvent foreign proof-gathering restrictions.

This application is not an attempt to "circumvent foreign proof-gathering restrictions" or other policies of Romania or the United States; it is a good faith effort to access probative and highly relevant evidence for use in the Romanian proceedings. "'[P]roof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Mees*, 793 F.3d at 303 n.20 (quoting *Intel*, 542 U.S. at 265) (alteration added by *Mees*). Judges in this District have held that for a respondent to demonstrate circumvention, an applicant must have acted in bad faith. *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018); *see also In re Auto-Guadeloupe Investissement S.A.*, No. 12 MC 221 (RPP), 2012 WL 4841945, at *23 (S.D.N.Y. Oct. 10, 2012) (finding that an applicant "may have acted in bad faith" by mischaracterizing foreign case).

The Supreme Court expressly rejected the proposition that Section 1782 requires that the evidence be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad. *Brandi-Dohrn*, 673 F.3d at 82; *see Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Rather, this factor looks primarily to whether the discovery sought seriously offends the public policy of the forum state

or the United States. *In re Okean B.V.*, 60 F. Supp. 3d 419, 428-30 (S.D.N.Y. 2014) (rejecting discovery of documents because "it would offend core tenets of our legal system (and those of Russia and Ukraine)"); *see also In re Microsoft Corp.*, 428 F. Supp. 2d 188, 195-96 (S.D.N.Y. 2006).

Romanian courts would readily accept the requested information if Applicant acquires it through the Section 1782 mechanism. There are no rules prohibiting the court in Romania from granting discovery over these documents – the foreign tribunals simply lack jurisdiction to compel the Respondents to provide the evidence. Radu Decl. ¶¶ 20-21. Applicant is not seeking to use Section 1782 for abusive purposes. The third *Intel* prong thus favors discovery.

### 4. The discovery sought is narrowly tailored to the needs of the foreign litigation and is neither burdensome nor intrusive.

The final *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." 542 U.S. at 265. Like all federal discovery, the proper scope of discovery under Section 1782 is governed by Federal Rule of Civil Procedure 26(b). *Mees*, 793 F.3d at 302; *accord In re Hansainvest*, 364 F. Supp. 3d at 251. Accordingly, district courts retain "broad authority" to impose reasonable limits and conditions on discovery orders issued under Section 1782. *See In re Malev*, 964 F.2d at 102. There is no reason for the Court to deny these reasonable and narrowly tailored discovery requests.

Applicant's discovery requests are relevant to central issues in the Romanian proceedings, and their burden is proportional to the needs and import of a case alleging serious abuses. They are narrowly tailored, which reduces the burden of discovery. They are limited in time and scope to documents produced in the New York bankruptcy proceedings. Those documents have already been organized, assessed for relevance, filtered for privilege, and produced, so producing them again will minimally burden Respondents. *See In re Gorsoan Ltd.*,

No. 17-cv-5912 (RJS), 2021 U.S. Dist. LEXIS 13402, at *18-19 (S.D.N.Y. Jan. 25, 2021) (distinguishing between files the respondent had previously produced in the U.S. and documents located abroad in foreign languages). Indeed, BSGR has already agreed to produce them to MAPO and ERI and has gone through the process of identifying relevant documents, which also weighs in favor of granting the application. *See In re Abraaj Inv. Mgmt. Ltd.*, No. 20-MC-229 (VSB),2023 L 2674752, at *6 (S.D.N.Y. Mar. 29, 2023) (finding compliance with subpoenas comports with fair play and substantial justice where tailored subpoenas were similar to subpoenas that defendants had received in the past).

There is no reason to believe that these documents, produced in litigation in this District, are no longer present here. In any event, the original location of the documents is irrelevant – the documents were originally produced in the United States, and in the digital age, the location of document is no longer a particularly relevant inquiry where electronically stored information may be accessible anywhere in the world. *See In re Veiga*, 746 F. Supp. 2d 8, 26 (D.D.C. 2010) ("[Respondent] shall be required to produce only responsive documents located within the United States, a category that includes electronically stored information *accessible from within this District.*" (emphasis added)); *In re Bloomfield Inv. Res. Corp.*, 315 F.R.D. 165, 167 (S.D.N.Y. Feb. 25, 2016) (stating that Respondents had "not offered evidence showing that the [relevant] documents named in the subpoena are actually located in Russia, rather than in the United States *or in electronic files readily accessed by Respondents*") (emphasis added).

Even if Respondents hold some of the responsive documents abroad, Section 1782 does not explicitly restrict extraterritorial discovery. In *Intel*, the Supreme Court cautioned against introducing judicially created limitations on discovery that do not appear in the text of the statute, such as the foreign-discoverability requirement that it rejected: "If Congress had intended to

impose such a sweeping restriction on the district court's discretion, at a time when it was enacting liberalizing amendments to the statute, it would have included statutory language to that effect." 542 U.S. at 260 (internal quotation marks omitted). Because Section 1782 does not explicitly prohibit extraterritorial discovery, a district court may order discovery of evidence that a corporation "found in" the United States holds abroad. *See In re del Valle Ruiz*, 939 F.3d at 533; *see also Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1200 (11th Cir. 2016); *Union Fenosa Gas, S.A. v. Depository Tr. Co.*, No. 20 Misc. 188 (PAE), 2020 WL 2793055, at *25 (S.D.N.Y. May 29, 2020).

There is also no policy reason to protect these documents.  They are not privileged – they were produced in the bankruptcy litigation and are being produced in MAPO's Section 1782 proceeding.  Cleary, as a law firm, and ERI, as counsel to MAPO, are not immune from discovery for non-privileged documents that they hold. *Ratliff v. Davis, Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003).

Nor are the documents immune from discovery due to the bankruptcy protective order.[16] While the former administrators designated virtually all of the bankruptcy discovery as confidential, Cleary argued that many of these designations were not permissible under the protective order and announced that it would no longer treat these documents as confidential. Opp. to Mot. for an Order (I) Affirming Confidentiality Designations and (II) Modifying the Court's Confidentiality Stipulation & Request for Sanctions 1-5, 12-27, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. May 26, 2020) (Dkt. 97).  Indeed, the former administrators implicitly

---

[16] In any event, the protective order could not prevent BSGR and A&M from producing these documents, because – unlike Cleary – they did not obtain them through discovery. "[A] protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).

acknowledged that the majority of the bankruptcy discovery does not merit confidential treatment. *Id.* at 11, 26. And the A&M administrators agree "that many of the Former Joint Administrators' designations may be inconsistent with the Protective Order." Letter to Judge Lane from Steven J. Reisman 1-2, *In re BSG Res. Ltd.*, No. 19-11845 (Bankr. S.D.N.Y. Nov. 9, 2020) (Dkt. 126). There is no protective order entered in MAPO's Section 1782 proceeding.

The limited discovery sought from Respondents is thus neither unduly intrusive nor burdensome and falls well within the scope of discovery that the Federal Rules allow.

## VI. <u>CONCLUSION</u>

The information sought by this application would provide significant assistance for the full and fair adjudication of the Romanian proceedings. For the foregoing reasons, Applicant respectfully requests that the Court enter an Order granting leave to serve Respondents with the discovery attached to this application as Exhibit B.

Dated:      New York, New York
           May 23, 2023

                                   By:   <u>**/s/ Jennifer Blecher**</u>
                                          Jennifer Blecher
                                          SEIDEN LAW LLP
                                          322 Eighth Avenue
                                          Suite 1200
                                          New York, New York 10001
                                          (212) 337-3502