# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

*In re* Petition of Organized Crime and Corruption
Reporting Project,

       Applicant,

For an Order Granting Leave to Issue Subpoenas to
BSG Resources Ltd., Alvarez & Marsal Holdings,
LLC, Cleary Gottlieb Steen and Hamilton LLP, the
Marginalised Affected Property Owners Association,
and EarthRights International for Taking of Discovery
Pursuant to 28 U.S.C. § 1782

Civil Action No. 23-172

---

**DECLARATION OF PAUL RADU IN SUPPORT OF THE PETITION OF ORGANIZED
CRIME AND CORRUPTION REPORTING PROJECT PURSUANT TO 28 U.S.C.
§ 1782, FOR TAKING OF DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

I, Paul Radu, declare the following:

1. I am the co-founder and Head of Innovation at the Organized Crime and Corruption
   Reporting Project ("OCCRP").

2. OCCRP is an investigative reporting platform for a worldwide network of independent
   media centers and journalists. OCCRP provides media outlets and journalists with a range
   of critical resources and tools including digital and physical security and allows those
   covering the most sensitive topics to work in teams with trusted editors.

3. One of OCCRP's partners is the investigative journalism outlet RISE Project Romania.

4. OCCRP has developed an investigative data platform to search and cross-reference more
   than three billion records to trace criminal connections and patterns and efficiently
   collaborate across borders.

5. OCCRP also partners with advocacy groups to push for justice and change, as well as to provide evidence that enables law enforcement to act.

6. Much of OCCRP's reporting focuses on exposing crime and corruption at the highest levels. This has included reporting on the Israeli mining billionaire Beny Steinmetz. OCCRP has already published articles concerning Steinmetz' control of and ties to a mining company that bears his initials, BSG Resources ("BSGR"), and is in the process of investigating, with a view to publication, matters related to Steinmetz' connections with Global Special Opportunities Ltd. ("GSOL") and individuals tied to this company (notably Sabby Mionis, Marcos Camhis and Ioannis Procopis); the company Gabriel Resources and its plans for the Rosia Montana gold mine in Romania; and further reporting on BSGR's iron ore mining business in Guinea; and affiliated company Octea's diamond mining business at the Koidu Mine in Sierra Leone. These matters relate to allegations of financial wrongdoing.

7. As part of this process, OCCRP has reached out to Mr. Steinmetz and associates of Mr. Steinmetz for comment on future articles.

8. On February 21, 2023, Beny Steinmetz filed a civil lawsuit against me, OCCRP, and the RISE Project Romania alleging that our reporting on him was defamatory, harassing and a violation of his privacy. He seeks a retraction, damages and an injunction from further reporting. An original copy of the complaint identifying myself and OCCRP as defendants is attached as **Exhibit 1**. An English translation is attached as **Exhibit 2**.

9. The complaint concerned not just articles that have been published, but also those that may be published in the future. The complaint is, in particular, focused on questions that

OCCRP asked Steinmetz ahead of a planned series of articles, including about BSGR, Octea and the Koidu Mine.

10. On April 28, 2023, the Romanian court returned the complaint because of a procedural defect. I am informed by my Romanian counsel that Mr. Steinmetz may correct the defect and the case may continue. Should the case be dismissed, Mr. Steinmetz is permitted to re-file the case within three years of learning of the matters he complains of. *See* Romanian Civil Code Article 2.517 (setting a general statute of limitations of three years) and Article 2.528 (statute of limitations for torts begins to run "from the date that the injured party knew or should have known" of both the damage and the identity of the party causing the damage). The full code is available, in Romanian, at https://legislatie.just.ro/Public/DetaliiDocument/255190.

11. I have reason to believe that Mr. Steinmetz will continue the action. On April 4, 2023, I received a cease-and-desist letter from Asserson Law Offices regarding a potential publication on OCCRP's website concerning. The letter threatens court action against OCCRP and me personally for defamation and an injunction. A copy of the letter is attached as **Exhibit 3**.

12. Notwithstanding Mr. Steinmetz' threats, OCCRP believes that its reporting is accurate and that publication of this information is in the public interest, and OCCRP and its partners intend to continue their efforts to report on Mr. Steinmetz involvement with these various mining projects.

13. I am informed by my Romanian counsel that, as in the United States, truth is an absolute defense to a claim of defamation in Romania.

14. In resolving the claims, the court will be required to rule on the accuracy of OCCRP's reporting on Steinmetz. The trial court will also have to evaluate whether the subject matter of OCCRP's reporting qualifies for the journalistic activities exemption to the GDPR, which requires that information be collected for the purposes of journalistic publication and that the editor reasonably believes that publication of the information serves an important public interest.

15. Recent disclosures, including at the January 2021 criminal conviction of Mr. Steinmetz in Geneva for a spectacular corruption scandal, have shown that Mr. Steinmetz has closely controlled BSGR and that financial and administrative services for all BSG Group companies, including Octea, are provided by a third-party service provider that is itself under the control of the BSG Group.[1]

16. This application requests targeted information in two general categories that are squarely relevant to the issues discussed in the previous section. The request is limited to materials that BSGR and its administrator A&M have already negotiated to produce in response to another Section 1782 application by the Marginalised Affected Property Owners.

17. First, the application seeks unprivileged documents already produced in the bankruptcy proceedings related to the internal governance of the BSG Group. This information is relevant to the issue of corporate structure and the degree of involvement Mr. Steinmetz.

18. Second, the application seeks unprivileged documents already produced in the bankruptcy proceedings related to the finances of the BSG Group as they relate to the Octea Group, which is also relevant to the issue of corporate structure and the degree of involvement of Mr. Steinmetz.

---

[1] *See* Tribunal Pénal, République et Canton de Genève, Procédure pénale P/12914/13 dirigée contre Benjamin STEINMETZ et deux autres prévenus (Jan. 22, 2021), available (in French) at https://justice.ge.ch/en/node/2243.

19. Based on OCCRP's reporting to date, I have reason to believe that these documents will also contain information on GSOL's involvement with Steinmetz, BSGR and Octea.

20. I am informed by my Romanian counsel that there is conceptually no barrier to the use of evidence from the United States in Romanian civil proceedings, so long as the documents are translated. *See* Romanian Civil Procedural Code Article 150 (providing for the submission of documents that parties wish to use in support of their case). The full code is available, in Romanian, at https://legislatie.just.ro/Public/DetaliiDocument/140271

21. I am informed by my Romanian counsel that Romanian courts lack jurisdiction to request documents from third parties who are located outside the country.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 17th day of May, 2023, in Bucharest, Romania

_____

Paul Radu

# Exhibit 1

**Subiect:** Cerere
**de la:** Nina Ghita <niculitaghita@gmail.com>
**Dată:** 21.02.2023, 16:11
**Către:** Cont Corespondenta Tribunalul Bucuresti Civil <trb-reg-civil@just.ro>

Cerere ordonanta presedintiala - Steinmetz Benyamin

Cu stima,
Niculita Ghita
Avocat - Baroul Avocatilor din Atena

─Ataşamente:────────────────────────────

| | |
|---|---|
| Steinmetz imputernicire din gr in ro.pdf | 744 KB |
| Steinmetz acord engleza romana.pdf | 1,1 MB |
| Steinmetz imputernicire greaca - engleza - romana.pdf | 1,4 MB |
| Articole Steinmetz.pdf | 1,8 MB |
| Steinmetz ordonanta presedintiala cerere.pdf | 6,5 MB |

TRIBUNALUL BUCUREȘTI
REGISTRATURA CIVILĂ
Nr. _____ din _____
Repartizat secției _____ 2 2 FEB 2023
Grefier, _____

**ROMANIA**
**TRIBUNALUL BUCURESTI**
**Bulevardul Unirii 37, Bucureşti 030823, România**
Telefon (centrala): 021.408.36.00; 021.408.37.00
Telefon cabinet preşedinte : 021.318.77.00

## DOMNULUI PREŞEDINTE AL TRIBUNALULUI BUCURESTI,

**- Interdictie de folosire a numelui in mediul online-**

**Subsemnatul:**

**Benyamin Steinmetz, a lui** Rubin, născut în Israel **la data de 02.04.1956, cetatean Israelian si Francez,** , titular al pasaportului israelian cu nr. 39032353 eliberat la data de 04/04/2022 de catre Serviciul de Pasapoarte si valabil pana la data de 03/04/2032, eliberat de Serviciul de Pasapoarte Ierusalim si al paşaportului francez cu numarul 18FV10326 eliberat la data de 23.01.2019 de Consulatul General al Frantei din Tel Aviv si cu valabilitate pana la data de 22.01.2029, reprezentat conventional prin Av. Niculita Ghita, membra a Baroului Avocatilor din Atena, numar de inregistrare 00034809, cu sediul procesual ales la Cabinetul de avocat Niculita Ghita, din Atena, strada Amfikleias 33, C.P. 11476, Republica Elena, **email:** niculitaghita@gmail.com, cu domiciliul ales la sediul cabinetului de avocat mentionata mai sus,

### In contradictoriu cu paratii

1. Paul Radu, **jurnalist de investigatie** din **Bucuresti**, co-fondator al Proiectului de Raportare a Crimei Organizate şi a Corupţiei Organized Crime and Corruption Reporting Project (OCCRP) si fondator al Organizatiei RISE Project Romania (publicatii online),

   http://www.riseproject.ro http://www.reportingproject.net
   http://www.investigativedashboard.org

2. Organized Crime and Corruption Reporting Project (OCCRP)
   **https://www.occrp.org/en,** contact: email: info@occrp.org

1

3. RISE Project România http://www.riseproject.ro
   CONTACT
   E-mail: contact [ at ] riseproject.ro
   Facebook: http://www.facebook.com/RiseProjectRo

## CERERE DE CHEMARE IN JUDECATA

**Prin care solicit:**

1. in principal, **interdictia de folosire a datelor mele personale si publicare de articole care fac referire la numele/datele mele personale, de catre jurnalistul Paul Radu si a publicatiilor/organizatiilor on line Organized and Corruption Reporting Project (OCCRP) si Rise Project Romania**, publicatii cu activitatea online, fara adresa de contact.
2. in subsidiar, folosirea datelor mele personale de catre oricare dintre jurnalistii publicatiilor/organizatiilor mentionate mai sus si stergerea articolelor referitoare la persoana mea din baza de articole a publicatiilor mai sus mentionate.
3. Sa dispuneti, pe cale de ordonanta presedintiala, fara citarea partilor, interdictia imediata a numitului Radu Paul, jurnalist, si **a** publicatiilor/organizatiilor on line Organized and Corruption Reporting Project (OCCRP) si Rise Project Romania de publicare a oricarui articol care face referire la numele meu, respectiv datetele mele personale si a coborarii/anularii/stergerii articolelor referotoare la persoana mea de pe platforma celor doua publicatii online, mai sus mentionate, pana la solutionarea definitiva a actiunii in cauza.
4. obligarea paratilor la plata cheltuielilor de judecata.

## MOTIVE

**In fapt, jurnalistul Radu Paul si** publicatiilor/organizatiilor on line Organized and Corruption Reporting Project (OCCRP) si Rise Project Romania de cel putin zece (10) ani publica si fac referire la datele mele personale, incluzand numele meu, in diferite articole defaimand si calomniind persoana mea.
Radu Paul prezinta aceste publicatii/organizatii, mai sus mentionate, ca find niste comunitati de jurnalisti, programatori si activisti care investigheaza crima organizata si coruptia care afecteaza Romania si tarile din regiune.

Spre exemplificare va prezint cateva articole aparute in mediul online si care au avut scopul clar si de necontestat de defaimare si calomniere a persoanei mele, facand uz de datele mele personale, si destabilizare, distrugere a personalitatii mele in lumea afacerilor si a afacerilor mele pe plan atat national (in Romania), cat si pe plan international (atat in U.E, cat si in afara U.E.)

***Articole de pe platforma electronica: www.riseproject.ro :***
https://www.riseproject.ro/?s=steinmetz

***Articol din data de 5/04/2016:***

„Secretele lui Steinmetz (II): pădurea din Snagov ascunsă în Panama
Documentele #PanamaPapers scot la lumină alte 20 de hectare pe care magnatul
israelian Beny Steinmetz le deține, pe ascuns, în Snagov. Suprafata descoperită
de RISE completează latifundia cunoscută a lui Steinmetz de la marginea
Bucureștiului, adică cele 46 de hectare aflate în Băneasa și Snagov – terenuri
din care o parte [...]"

***Articol din data de 4/04/2016:***
„Secretele lui Steinmetz (I)
RISE Project va prezenta în săptămânile ce urmează secretele fabricii de firme din
Panama. Începem cu Benjamin Steinmetz, unul dintre cei mai puternici afaceristi din
lume si cu dezlegarea itelor unei afaceri care a rezultat în colapsul rafinăriei RAFO
Onesti. Benjamin Steinmetz, 60 de ani, este unul dintre cei mai [...]"

***Articol din data de 21/06/2018:***

„Rețetele financiare ale miliardarului de la Roșia Montană #PanamaPapers2
Noi documente copiate din computerele casei de avocatură Mossack Fonseca
din Panama arată că miliardarul israelian Beny Steinmetz și familia sa sunt
beneficiarii finali ai unor afaceri derulate în domeniul imobiliar și minier în
România. O serie de emailuri și acte atasate acestora dezvăluie complexa retea
de companii și fundatii [...]"

***Articole de pe platforma ecectronica: www.occrp.org :***

1. Articolul: Miliardarul Beny Steinmetz este judecat pentru luare de mită
https://www.occrp.org/en/daily/13599-switzerland-miliardar-beny-steinmetz-
goes-on-trial-for-bribery
Publicat: 11 ianuarie 2021
Scris de OCCRP
2. Miliardarul minier și partenerii depun mărturie într-un caz emblematic de
mită elvețiană Publicat: 31 august 2022

3

Scris de Tom Stocks și Daniel Balint-Kurti
Un procuror elvețian, într-un caz de luare de mită, l-a acuzat pe investitorul
miliardar în minerit Beny Steinmetz și doi asociați că au fost „prinși cu mâinile în borcanul de gem" în timp ce o audiere de apel intră în ă treia zi la
Geneva.

3. Beny Steinmetz arestat în Grecia Publicat: 10 decembrie 2021
Reactualizat la data de 07.12.22, 16:49 Beny Steinmetz, arestat în Grecia
https://www.occrp.org/en/daily/15632-beny-steinmetz-arrested-in-greece
Scris de David Klein

4. Beny Steinmetz arestat în Grecia Publicat: 10 decembrie 2021
Reactualizat la data de 07.12.22, 16:50 Beny Steinmetz, arestat în Grecia
https://www.occrp.org/en/daily/15632-beny-steinmetz-arrested-in-greece
Scris de David Klein

5. Franța: Miliardarul Beny Steinmetz a pierdut un caz emblematic de luare de mită în Guineea (https://www.occrp.org/en/daily/16354-france-billionaire-beny-steinmetz-loses-landmark-guinea-bribery-case ) Pubicat la data de 21 Mai 2022
Scris de Daniel Balint-Kurti

6. Articol publicat la data de 25 ianuarie 2022, scris de Tom Stocks si actualizat la data de: 22.12.22, 16:51 cu titlul "Tribunalul elvețian îl trimite pe Beny Steinmetz la închisoare pentru luare de mită în Guineea" https://www.occrp.org/en/daily/13712-swiss-court-sends-beny-steinmetz-to-prison-for-bribery-in-guinea

7. Articol publicat la data de 18 ianuarie 2021 si reactualizat la data de 22.12.22, 16:53 Procurorii elvețieni cer 5 ani pentru miliardarul Beny Steinmetz https://www.occrp.org/en/daily/13646-swiss-prosecutors-seek-5-years-for-miliardar-beny-steinmetz
Scris de OCCRP

Acestea sunt cateva exemple din "obsesia" pe care o are Radu Paul si publicatiile/organizatiile on line Organized and Corruption Reporting Project (OCCRP) si Rise Project Romania referitoare la persoana mea si inainte de a fi obtinuta o sentinta definitiva impotriva mea.
Mentionez ca impotriva Sentintei Penale cu numarul 39/F din data de 27.06.2019 prin care am fost condamnat la 5 (cinci) ani de inchisoare pentru constituire de grup infractional organizat si pentru care am formulat apel la Inalta Curte de Casatie si Justitie prin care sentinta a ramas definitiva,

4

pronuntata in sedinta publica din data de 17 decembrie 2020 (singura de altfel in care am fost condamnat) m-am adresat Curtii Europene a Drepturilor Omului si incă nu s-a judecat (evident, acest lucru nu este mentionat in niciun articol al publicatiilor de mai sus).

Articolele postate de jurnalistul Radu Paul si publicatiile online mai sus mentionate ridică multe semne de intrebare cu privire la independența acestora si voința acestora de a raporta corect și echitabil chestiunile legate de mine. Într-adevăr, natura acuzațiilor, modul în care sunt redactate întrebările acestora și timpul scurt alocat pentru răspuns, arată o obsesie față de mine, similară cu cea afișată de George Soros. Faptul că organizația acestuia (Radu Paul) este finanțată în mare parte de domnul Soros și de fundațiile sale afectează material investigația.

Prin urmare, cu toate ca am solicitat de nenumarate ori (prin mail) să detalieze toate legăturile acestuia si a organizatiilor conduse de acesta cu domnul Soros, inclusiv toate finanțările oferite, nu am primit niciodata raspuns si sunt convins ca nici statul roman nu are cunostinta de finantarile respectivelor platforme online. Pentru a asigura transparența și raportarea corectă, am solicit ca toate aceste linkuri să apară vizibil în oricare dintre publicațiile jurnalistului Radu Paul despre mine e evident, acest lucru nu s-a intamplat niciodata.

În plus, am fost informat în mod sigur că un reporter care cooperează îndeaproape cu jurnalistul Radu Paul si datorita exprimarii unei pareri diferite raportata la articolele care fac referire la datele mele personale, a fost determinat să părăsească un alt ONG finanțat de Soros sub suspiciuni serioase de corupție. Doresc să subliniez că majoritatea acuzațiilor publicate de jurnalistul Radu Paul si organizațiile mai sus mentionate provin din documente care provin din diverse proceduri la nivel global. Pe scurt:

Vale - Acuzațiile lui Vale împotriva domnului Steinmetz au fost respinse cu prejudiciu de Înalta Curte din Londra, în februarie 2022.
Condamnarea României — După cum bine știți, această decizie a fost considerată ca fiind grav viciată și probabil să fi provenit din considerente politice, atât de către Interpol, cât și de către Curtea de Apel din Atena, care a respins executarea cererilor de extrădare și arestare. **Acuzatiile si arestarea au fost publicate online, respeingerea si acordarea de prejudiciu precum si respingerea cererii de extradare si arestare nu au fost mentionate niciodata.**
Litigii IMR/Cunico - IMR (care sunt ei înșiși supuși investigațiilor de corupție) a făcut o serie de acuzații împotriva BSGR și a mea într-o dispută complexă a acționarilor cu privire la Cunico. Toate aceste acuzații fără temei au fost acum retrase. **In publicatiile online nu s-a mentionat niciodata acest lucru.**
Gabriel Resources — Persoana mea nu are nimic de-a face cu această companie sau cu litigiul ei. BSG Capital Markets, în care eu nu am nicio implicare sau control, a achiziționat în 2009 ceea ce reprezintă acum mai puțin de 9% din

5

acțiunile Gabriel Resources. Orice afirmație conform căreia eu am vreo implicare într-o activitate (legală sau de altă natură) referitoare la Gabriel Resources o resping cu fermitate **si nu exista nici o masura legala dispusa in acest sens cu referire la persoana mea.**

Guineea - Republica Guineea a ridicat o serie de acuzații împotriva mea. Tribunalul ICSID a emis o hotărâre vara trecută care face în prezent obiectul unei cereri de anulare. Nici acest lucru nu este mentionat in articolele in cauza.

George Soros

Pretenția BSGR împotriva domnului Soros

M-a acuzat că, prin BSGR, am îndrăznit să depun o cerere împotriva finanțatorului acestora semnificativa (paragrafele 16, 36, 37 și 50). Solicit si acum sa menționeze pe deplin toate legăturile acestora cu domnul Soros și organizatiile sale. Într-adevăr, este destul de remarcabil că mi se fac aceste acuzații când domnul Soros și organizatiile sale, inculpați în acest caz, sunt unul dintre principalii binefăcători ai organizației condusa de Paul Radu.

Avem încredere că acest conflict de interese și lipsa de independență vor fi dezvăluite în mod vizibil în oricare dintre publicațiile online despre mine și, astfel, în interesul transparenței și al raportării corecte, a căror apărători se prezinta.

Impotriva BSGR. Articol reprodus de jurnalistul Radu Paul prin organizatiile sale, in mediul online.

Vale a introdus o cerere de conspirație împotriva mea și a altor co-inculpați la Tribunalele Comerciale din Londra. După o procedură lungă de doi ani și doar patru săptămâni într-un proces de unsprezece săptămâni. Cererea lui Vale împotriva mea și a altor co-inculpați, cu privire la aceleași fapte asupra cărora Tribunalul LCIA s-a pronunțat, a fost respinsă cu prejudiciu de Înalta Curte din Londra în februarie 2022. **Fapt care nu a fost mentionat in publicatiile online in cauza.**

În diferite proceduri deschise împotriva BSGR, a mea și a altor entități, Vale a caracterizat GSOL și persoanele menționate mai sus, drept „agent și nominalizat" pentru BSGR sau despre mine. Aceste afirmații au fost negate cu fermitate de către toți împotriva cărora au fost făcute și acele afirmații nu au făcut niciodată obiectul unei decizii legale. **Neprezentare in articole din mediul online ale organizatiilor in cauza.**

Pe aceasta cale precizes că nici GSOL, nici Sabby Mionis, Marcos Camhis sau Ioannis Procopis nu au acționat vreodată ca agent sau nominalizați, în nicio tranzacție la care se face referire în aceast articol sau în orice alte circumstanțe. Domnul Sabby Mionis este el însuși un om de afaceri de mare succes.

Ca o chestiune de clarificare, Koidu nu se află în mâinile GSOL, este deținut în totalitate de Octea care este deținut în totalitate de BSGR. **Acuzatii care au fost făcute în procedurile care au fost respinse cu acordare de prejudiciu.**

România

Procedura penala romaneasca

6

Acuzațiile de la paragrafele 9 până la 12 provin din procesul penal din România împotriva mea și a altor coinculpați.

În 2019, după un proces de trei ani, am fost achitat în totalitate de instanța din Brașov. Judecătorul a emis o decizie de peste 300 de pagini în care detaliază motivele achitării mele.

Procurorii au făcut imediat recurs împotriva acestei decizii și au fost numiți trei judecători, renumiți pentru rata mare de condamnare și denumiți în mod public drept „Completul Negru".

O rejudecare completă a avut loc în 2020 în fața Inaltei Curți de Justitie de la București. Această a doua instanță a fost foarte motivată din punct de vedere politic și procedura a fost plină de nereguli, inclusiv interceptări ilegale și traduceri parțiale ale acestora. La 17 decembrie 2020, judecătorii m-au condamnat pe mine și pe co-inculpații mei, inclusiv un avocat, la pedepse de închisoare. Acest avocat, Robert Rosu, a fost in cele din urma achitat dupa un an de grații.

**În octombrie 2021, Interpol a casat mandatul de arestare care a fost emis, la cererea autorităților române, împotriva mea**. **Evident, acest aspect nu a fost niciodata mentionat in publicatiile on line, in cauza**. Comisia Interpol a hotărât că procedura românească condusă împotriva mea a fost grav viciată și probabil că ar fi provenit din considerente politice. **În mod similar, Curtea de Apel din Atena a casat cererea de extrădare a României din aceleași considerente**. Alte țări europene au împărtășit aceeași poziție. **Toate aceste lucruri nu au fost subiect de articole in publicatiile online in cauza.**

Am depus, de asemenea, recurs la Curtea Europeană a Drepturilor Omului în octombrie 2021, invocând încălcări ale articolului 6 alineatul (1) CEDO (lipsa de corectitudine, absența administrării corespunzătoare a probelor, lipsa independenței/imparțialității) și a articolului 6. (3) CEDO (refuzul de a lua în considerare probele de apărare, refuzul de a dezvălui dovezi ale potențialei lipse de independență, încălcarea dreptului la un avocat la alegere, încălcarea dreptului la interogatoriu martorilor și înlocuirea acuzațiilor). **Aceste proceduri sunt încă pe rol**. **Pentru curatetea informatiilor aceste aspecte ar fi trebuit mentionate in publicatiile online in cauza**.

Gabriel Resources /Rosia Montana

De asemenea, au postat prin articolele acestora diverse acuzații despre Gabriel Resources (paragrafele 22, 23 și 47). Eu nu am avut absolut nimic de-a face cu acest proiect și nici cu procedurile ICSID aferente.

În cele din urmă, neg în continuare că Președintele Romaniei a chemat vreodată, în prezența sa, ministrul Minelor pentru a acorda BSGR lui orice drepturi de exploatare. După cum s-a discutat mai sus, această acuzație a fost făcută de un martor de stat care a primit plăți de la reprezentanții Guineei înainte de a depune mărturie. Există chiar indicii că unele dintre aceste fonduri au venit de la părți afiliate Soros. Minciunile acestora despre mine au fost descoperite în timpul procedurilor judiciare.

7

Prin articolele postate s-a pretins că am efectuat o declarație pe propria răspundere în aprilie 2013 (paragraful 8). Acest lucru este neadevărat. Nu am efectuat niciodată această declarație pe propria răspundere.

Guineea

Prin articolele postate in mediul online  s-a făcut mai multe acuzații cu privire la presupusul interes al meu în Niron (punctele 13, 18 și 46).

În 2019, eu nu am fost consilier al BSGR. La acel moment, BSGR se afla sub o administrare desemnată de Curte.

Este o informare publică că eu am asistat la negocierile unui acord provizoriu între BSGR și Republica Guineea. Termenii acestui acord nu au fost niciodată finalizați. Contrar afirmațiilor acestora, Nimba nu face parte din acest acord. Repet pentru consemnare ca, domnul Mionis, domnul Camhis și domnul Procopis, sau orice companie la care se face referire, nu au acționat niciodată ca mandatari pentru mine sau vreuna dintre companiile aferente mie. Nu am avut niciodată vreun interes, direct sau indirect, în GSOL sau în oricare dintre subsidiarele sale, inclusiv Niron. Nu am fost niciodată proprietarul efectiv al Niron, nici a vreuneia dintre Companiile aflate sub fundațiile cărora sunt unul dintre beneficiari.

În orice caz, Republica Guineea nu a așteptat nicio Acordare sau vreo decizie a Tribunalului ICSID de a acorda blocurile 1 și 2 Simandou unui terț care controlează efectiv întreaga gamă de Simandou. Conde (încă cu sprijinul lui Soros) a acordat în esență un activ (pe care BSGR/Vale JV îl cheltuise mai mult de 1,2 miliarde) unui terț fără nicio licitație. **Menționăm că organizațiile in cauza, intamplator sau nu,  nu a investigat niciodată această atribuire ulterioară a drepturilor miniere si nu a facut referire niciodata la acest aspect, in mediul online, Lasand doar sa se inteleaga ca numele meu este implicat in acest aspect.**

Mi s-au oferit, în condiții de concurență, opțiuni în Niron pentru a fi exercitate la încheierea unei tranzacții, tranzactie insa care nu a avut loc niciodată.


Procedura ICSID

Organizatiile in cauza au publicat o serie de acuzații cu privire la revendicarea BSGR privind tratatul de investiții împotriva Republicii Guineea (punctele 2, 21 și 48).

Este absurd să pretindem că BSGR a formulat o cerere ICSID doar pentru a face presiuni asupra Guineei să încheie o înțelegere. BSGR a depus o cerere ICSED de bună credință împotriva Guineei pentru despăgubiri pentru a compensa exproprierea ilegală a drepturilor sale miniere și investițiile asociate din Guineea.

Tribunalul nu a reușit să se pronunțe asupra dovezilor abundente și convingătoare ale motivelor corupte ale Guvernului Guineei de a revoca

8

drepturile miniere ale BSGR. Această decizie TCSID face în prezent obiectul unei proceduri de anulare.

Ca o chestiune de clarificare, BSGR nu a formulat niciodată vreo pretenție ICSED împotriva României. Nu este clar ce se înțelege prin „țări precum România sau Guineea". BSGR nu este cu siguranță singurul investitor care a introdus pretenții ICSED împotriva Republicii Guinea, iar România este subiectul a zeci sau mai multe reclamații ICSED. Ambele țări au pierdut multe dintre acele proceduri de arbitraj care au statuat asupra practicilor lor ilegale.

Vale

Acuzațiile online din paragrafele 13, 14, 17, 42 și 45 au fost făcute de Vale.

Fundația Balda, a cărei beneficiar sunt, deține, prin BSG Capital Markets, un pachet minoritar (sub 9%) la Gabriel Resources, deținătorul drepturilor miniere românești la Roșia Montană. Ca parte interesată, Fundația Balda va beneficia de un premiu ICISD favorabil Gabriel Resources, dacă o astfel de atribuire a avut vreun efect pozitiv asupra prețului acțiunii sale.

Nu este clar de ce ma acuza pe mine față de ceilalți actionari ai Gabriel Resourcés, și anume Tenor Fund. Eu nu am cunoștințe despre finanțarea acestei cereri de arbitraj ICSID împotriva României și dacă are vreo legătură cu Tenor Capital. Nu am făcut nicio investiție în Tenor Capital și nici măcar nu m-am întâlnit cu niciunul dintre reprezentanții acesteia. Aceasta este o altă poveste complet inventată.

În plus, referitor la întâlnirea mea cu domnul Tăriceanu în Israel, aveam, la acea vreme, mai multe investiții în România. Nu s-a discutat despre Rosia Montana. Insinuările din articolele postate, de fapte greșite sunt negate cu fermitate.

Sierra Leone

De asemenea, au ridicat o serie de acuzații despre mina de diamante a lui Koidu în paragrafele 24 până la 31. Toate acuzațiile de fapte greșite sunt negate cu fermitate.

Subliniaz că nu sunt implicat în managementul Koidu. Koidu este deținută de Octea, care este ea însăși o subsidiară a BSG Resources. După cum bine se stie, BSG Resources se află sub o administrație desemnată de instanță.

Au susținut că mai mulți directori ai Octea au fost rugați să prezinte declarații pe propria răspundere cu privire la rolul meu. Nu am cunoștințe despre acest lucru, si din articlolele postate in mediul online nu sunt furnizate mai multe detalii.

Din câte știu despre acest proiect, Octea/Koidu este un exemplu de proiect bine organizat și respectă cele mai bune practici din industria minieră din Sierra Leone și din Africa.

Macedonia

Au postat acuzații suplimentare despre mine și BGSR și implicarea noastra în industriile FENI din Macedonia (paragrafele 15, 32, 33, 34 și 35):

Neg orice legătură între aceste acuzații.

Toate acuzațiile publicate in mediul online, au fost făcute în cursul unei dispute juridice între BSGR și fostul său partener, IMR. Această dispută a fost soluționată și toate acuzațiile nefondate au fost retrase. **In articolele online nu se face referire la acuzatiile retrase.**

GSQL

Au făcut acuzații destul de serioase cu privire la legăturile mele cu GSOL și directorii săi (paragrafele 13, 19, 20, 43 și 44):

Articolul postat susține că eu as avea un anumit grad de control sau influență asupra acțiunilor GSOL și as beneficia de activele acesteia (punctul 19) și întreba la punctul 43 dacă am vreo relație juridică cu GSOL. Repet odată pentru totdeauna că nu am control asupra GSOL și nici GSOL și nici afiliații săi nu sunt agenți sau nominalizați ai mei și nu există nicio relație juridică între ei.

După cum sa explicat mai sus, Vale este cea care a pretins că GSOL și directorii săi erau agenți și nominalizați de mine. Pretinderile lui Vale împotriva mea nu aveau absolut niciun fond și au fost respinse cu acordare de prejudiciu de către Înalta Curte din Londra.

Afirmația acestora legată de achiziționarea datoriei lui Octea, bazată pe o declarație făcută de o persoană neidentificată de la Standard Chartered Bank, este neadevărată. Din informatiile detinute, toate tranzacțiile legate de datoria Octea au fost înregistrate în condiții de concurență.

Din cele prezentate, rezulta ca scopul direct, inconfundabil, neintemeiat, ilegal si nebazat al jurnalistului Radu Paul si a organizatiilor cu publicatii online urmaresc de-a lungul timpului activitatea acestuia si scopul publicarii articolelor in mediul online care fac referire la mine, folosind datele persoanele ale mele, sunt sa imi daunezе, sa-mi afecteze imaginea publica si sa-mi afecteze interesele mele de afaceri.

**Motivatie juridica:**

In esenta, acțiunea civilă este ansamblul mijloacelor procesuale prevăzute de lege pentru protecția dreptului subiectiv pretins de către una dintre părți sau a unei alte situații juridice, precum și pentru asigurarea apărării părților în process. Oricine are o pretenție împotriva unei alte persoane ori urmărește

soluţionarea în justiţie a unei situaţii juridice are dreptul să facă o cerere înaintea instanţei competente (art. 30, par.1, C.Civ.).

Organizatia OCCRP, care isi desfasoara activitatea in mediul online, pe situl acesteia se prezinta că lucrează "cu grupuri de advocacy, înarmând societatea civilă cu informaţii pentru a face presiuni semnificative în favoarea justiţiei şi a schimbării, şi scoate la iveală dovezi care permit organelor de aplicare a legii să acţioneze".

Declaratie care lasa de dorit, insulta justitia, principiul de independenta al sistemului de justitie din Romania si de oriunde din lume, insinueaza ca justitia in Romania, in principal, si in lume, in general, se aplica doar daca exista presiune semnificativa din partea acesteia. De asemenea insinueaza ca instrumentele de care dispune un stat de drept, adiacente sistemului de justitie sunt insuficiente sau incompetente si numai prin aportul acestora sunt evidentiate dovezi care permit acestor organe de aplicare a legii sa actioneze.

In privinta persoanei mele, consider ca „insistenta" si „consecventa" a publicarii de articole care fac referire la persoana mea si uzeaza de datele mele personale a depasit orice limita. Limita depasita tine de delicte contra onoare si demnitatii mele si este incadrata juridic in Codul Penal. Mai exact, in:

"Acela care în public prin orice mijloace afirmă cu privire la o persoană sau imputã acesteia fapte determinate privitoare la viaţa sau activitatea ei publică, care, dacă ar fi adevărate, ar expune acea persoană la urmărire penală sau disciplinară, ori dispreţului public, comite delictul de calomnie în contra vieţii publice şi se pedepseşte cu închisoare corecţională dela 3 luni la un an şi amendă dela 2.000 la 5.000 lei" (art.507)

"Acela care în public prin orice mijloace afirmă cu privire la o persoană sau imputã acesteia fapte determinate privitoare la vieaţa sa particulară, activitatea sa profesională, sau cinstea ei personală, care, dacă ar fi adevărate, ar expune acea persoană la urmărire penală sau disciplinară, ori dispreţului public, comite delictul de calomnie în contra vieţii private şi se pedepseşte cu închisoare corecţională dela 6 luni la 2 ani şi amendă dela 2.000 la 8.000 lei." (art.508)

"Pedeapsa calomniei în cazul art. 507, este închisoarea corecţională dela 6 luni la un an şi amenda dela 2.000 la 5.000 lei, dacă delictul este comis:
1. în contra unui corp constituit în Stat sau contra unei administraţii publice, ori în contra unei administraţii sau întreprinderi, în care sunt angajate interese publice, în contra unui membru al acestora, sau în contra unui funcţionar public;
2. prin presă, prin orice mijloace de difuzare, ori în adunări publice;
3. din motive josnice." (art.509)

"În cazul când se afirmă sau se răspândesc fapte, ori se fac imputări sau afirmaţiuni pentru care legea nu admite proba verităţii, faptul constitue delictul

11

de defăimare şi se pedepseşte cu închisoare corecţională dela 2 la 6 luni şi amendă dela 2.000 la 3.000 lei" (art.510).

"În caz de calomnie sau injurie se poate face proba verităţii, imputării sau afirmaţiei în următoarele cazuri:

1. dacă imputarea sau afirmaţia s'a făcut pentru proteguirea sau conservarea unui interes public, sau unui interes particular important şi temeinic.

Prin interes public, se înţelege:

a) asigurarea unei cât mai bune recrutări a elementelor chemate a îndeplini funcţiuni sau servicii publice;

b) respectarea legilor, regulamentelor şi ordonanţelor;

c) prevenirea abuzurilor în administraţiile publice;

d) apărarea, intereselor unei clase sociale, ale unei confesiuni recunoscute de stat sau ale unei profesiuni;

2. dacă imputarea sau afirmaţia face obiectul unei acţiuni penale sau disciplinare în curs;

3. dacă imputarea sau afirmaţia sunt constatate ca adevărate printr'o hotărîre judecătorească;

4. dacă cel calomniat sau injuriat cere expres să se facă proba verităţii;

5. dacă imputarea sau afirmaţia se referă la vieaţa publică a unui funcţionar sau particular." (art.514

"Proba verităţii este interzisă, în orice caz şi chiar în cazurile prevăzute în art. 514

1. dacă partea ofensată este vreuna dintre persoanele arătate în art. 205;

2. dacă imputarea sau afirmaţia priveşte un fapt asupra căruia o instanţă judecătorească sau disciplinară a pronunţat achitarea sau reabilitarea."(art.515)

"Proba verităţii este admisă numai cu condiţia ca imputarea sau afirmaţia, cât şi forma în care s'au făcut, să fi fost necesare în scop de a protegui sau a conserva un interes public, în următoarele cazuri:

1. dacă imputarea sau afirmaţia priveşte vieaţa intimă a unei persoane sau familii, sau onoarea unei femei, întru cât nu ar fi vorba de o infracţiune urmărită din oficiu;

2. dacă imputarea sau afirmaţia se referă la o infracţiune ce se poate urmări numai la plângerea, prealabilă a părţii vătămate, care nu a făcut o asemenea plângere şi inculpatul ştia aceasta în timpul comiterii infracţiunii." (art.516)

"Acţiunea penală pentru calomnie, defăimare şi injurie se poate pune în mişcare numai la plângerea prealabilă a părţii vătămate." (art.518).

## Protecţia datelor şi a vieţii private în mediul on-line

Normele UE garantează că datele cu caracter personal sunt protejate ori de câte ori este nevoie de colectarea lor. Aceste norme **se aplică atât companiilor şi**

organizațiilor (publice și private) din UE, cât și celor din afara UE care oferă bunuri sau servicii în UE.

Drepturile în materie de protecție a datelor trebuie să fie respectate, **indiferent de modul în care sunt colectate** – on-line, într-un sistem computerizat sau pe hârtie, într-un fișier structurat.

Normele UE referitoare la protecția datelor, incluse în așa-numitul Regulament general al UE privind protecția datelor (RGPD), descriu diversele situații în care o companie sau organizație **are permisiunea de a colecta sau reutiliza informațiile dumneavoastră cu caracter personal.**

În orice alte situații, compania sau organizația **trebuie să ceară acordul** (consimțământul) înainte de a putea colecta sau reutiliza datele cu caracter personal.

**Ștergerea datelor cu caracter personal (dreptul de a fi uitat)**

Dacă datele nu mai sunt necesare sau dacă sunt folosite ilegal, se poate solicita ștergerea lor. **Este vorba despre așa-numitul „drept de a fi uitat".**

**Aceste norme se aplică și în cazul motoarelor de căutare,** cum ar fi Google, pentru că și acestea sunt considerate operatori de date. **Se poate cere ca linkurile către paginile de internet care conțin numele să fie eliminate din motoarele de căutare, dacă informațiile sunt incorecte, inadecvate, nerelevante sau excessive, ca in cazul mentionat.**

Dacă o companie a publicat on-line date cu caracter personal și s-a solicitat ștergerea acestora, compania respectivă trebuie să informeze **orice alte site-uri** pe care s-au publicat datele pentru care s-a cerut ștergerea lor și a linkurilor către ele.


**Acordul pentru procesarea datelor: consimtământul**

Dacă datele du cu caracter personal sunt furate, pierdute sau accesate ilegal - așa-numita **încălcare a securității datelor** - operatorul de date (persoana sau organismul care procesează datele cu caracter personal) trebuie să semnaleze acest lucru autorității naționale pentru protecția datelor. Operatorul de date trebuie, de asemenea, să vă informeze în mod direct dacă există riscuri serioase la adresa datelor personale și a vieții dumneavoastră private ca urmare a încălcării securității acestor date.

**Înaintarea unei plângeri**

În cazul în care drepturile în materie de protecție a datelor au fost încălcate, se poate adresa o plângere direct autorității naționale pentru protecția datelor. Aceasta va face investigații și va da un răspuns în termen de 3 luni.

13

O altă posibilitate este intentatarea unei acțiuni în justiție împotriva companiei sau organizației în cauză.

Prin aceasta actiune imi rezerv **dreptul la despăgubiri** suferita de pagube materiale (pierdere financiară) si nemateriale (suferință psihologică), din cauza jurnalistului Radu Paul si a organizatiilor in cauza datorita faptului ca nu respectă normele UE privind protecția datelor.

https://eur-lex.europa.eu/legal-content/RO/TXT/?uri=CELEX:32016R0679

Toate acestea sunt deduse din REGULAMENTUL (UE) 2016/679 AL PARLAMENTULUI EUROPEAN ȘI AL CONSILIULUI din data de 27 aprilie 2016, privind protecția persoanelor fizice în ceea ce privește prelucrarea datelor cu caracter personal și privind libera circulație a acestor date și de abrogare a Directivei 95/46/CE (Regulamentul general privind protecția datelor)

## Protecția datelor în conformitate cu RGPD

RGPD stabilește cerințele detaliate pentru companii și organizații în ceea ce privește colectarea, stocarea și gestionarea datelor cu caracter personal. Se aplică atât în cazul organizațiilor europene care prelucrează datele cu caracter personal ale cetățenilor din UE cât și în cazul organizațiilor din afara UE care vizează cetățeni din UE.

RGPD se aplică în cazul în care:

compania procesează date cu caracter personal și are sediul în UE, indiferent de locul în care se desfășoară prelucrarea efectivă a datelor

compania are sediul în afara UE, dar procesează date cu caracter personal în contextul furnizării de bunuri sau servicii către cetățeni din UE sau monitorizează comportamentul cetățenilor din UE

Companiile din afara UE care procesează date cu caracter personal ale cetățenilor europeni trebuie să desemneze un reprezentant în UE.

Datele cu caracter personal includ orice informații despre o persoană identificată sau identificabilă ( subiectul datelor). Printre datele cu caracter personal se numără:

numele

adresa

numărul cărții de identitate/pașaportului

venitul

profilul cultural

adresa IP (Internet Protocol)

datele deținute de medici sau spitale (care identifică o persoană în scopuri medicale)

Categorii speciale de date

Nu puteți procesa date care se referă la:

originea rasială sau etnică

orientarea sexuală

14

opiniile politice
convingerile religioase sau filosofice
apartenenţa sindicală
datele genetice, biometrice sau medicale, cu excepţia unor cazuri specifice (de
exemplu, când persoana şi-a dat consimţământul explicit sau când procesarea
este necesară din motive care ţin de un interes public major, definit de legislaţia
europeană sau naţională)

**datele personale referitoare la infractiuni sau condamnări penale, cu
exceptia cazului în care acest lucru este autorizat de legislaţia naţională sau
europeană**

Pe durata prelucrării, datele cu caracter personal pot ajunge la mai multe
companii sau organizaţii. În acest proces, apar două entităţi importante:
operatorul de date - decide în ce scop vor fi procesate datele cu caracter
personal
persoana împuternicită de operatorul de date - deţine şi procesează date în
numele operatorului de date
Compania /organizatia are obligaţia de a numi un responsabil cu protecţia
datelor atunci când:

**monitorizează cetăţeni periodic sau sistematic ori prelucrează categorii
speciale de date**

Responsabilul cu protecţia datelor poate fi un membru al organizaţiei sau o
persoană contractată extern pe baza unui contact de servicii. De asemenea, poate
fi o parte dintr-o organizaţie, nu neapărat o persoană.

Transferul de date în afara UE

Când datele personale sunt transferate în afara UE, protecţia oferită de RGPD ar
trebui să „călătorească" împreună cu ele. Aceasta înseamnă că dacă sunt
exportate date în străinătate, compania/organizatia trebuie să se asigure că cel
puţin una dintre prevederile următoare este pusă în aplicare:
protecţia oferită de ţara din afara UE este considerată adecvată de către UE
compania /organizatia ia măsurile necesare pentru a oferi protecţia adecvată, de
exemplu prin includerea de clauze specifice în contractul convenit cu
importatorul de date din afara UE
compania se bazează pe derogări specifice care permit transferul, cum ar fi
consimţământul persoanei

Potrivit normelor UE privind protecţia datelor, ar trebui să fie prelucrate datele
în mod corect şi legal, pentru un scop specific şi legitim şi doar acele date care
sunt necesare pentru îndeplinirea scopului respectiv. Pentru a prelucra date cu
caracter personal trebuie îndeplinite una din următoarele condiţii:
consimţământul persoanei vizate, nevoie de date personale pentru a onora
o obligaţie contractuală faţă de persoana în cauză, nevoie de datele personale
pentru a îndeplini o obligaţie legală, nevoie de datele personale pentru a
proteja interesele vitale ale persoanei vizate, prelucraţi date cu caracter personal

15



pentru a îndeplini o sarcină în interesul publicului, sa se acționeze în interesul legitim al companiei, atâta timp cât nu sunt afectate în mod serios drepturile și libertățile fundamentale ale persoanelor ale căror date sunt prelucrate. **Dacă drepturile persoanei prevalează asupra intereselor companiei, nu se pot prelucra datele cu caracter personal.**

Acordul față de prelucrarea datelor: consimțământul
RGPD prevede norme stricte pentru prelucrarea datelor pe baza consimțământului. Scopul acestor norme este să garanteze că persoana vizată înțelege pentru ce își acordă consimțământul. De aceea, consimțământul trebuie să fie acordat în mod liber, specific, informat și lipsit de ambiguitate, prin intermediul unei cereri prezentate într-un limbaj clar și simplu.
**Dreptul de a corecta datele și dreptul de a obiecta**
Dacă o persoană consideră că datele sale cu caracter personal sunt incorecte, incomplete sau inexacte, persoana respectivă are dreptul de a le corecta sau completa fără întârziere.
**În acest caz, trebuie informați pe toți destinatarii datelor dacă o parte din datele pe care le-ați partajat cu ei au fost modificate sau șterse. Dacă o parte din datele partajate s-au dovedit a fi incorecte, trebuie să îi informați în legătură cu acest lucru pe toți cei care le-au vizualizat (cu excepția cazului în care această acțiune ar presupune un efort disproporționat).**
O persoană poate obiecta în orice moment față de prelucrarea datelor sale personale, atunci când compania prelucrează datele respective în baza unui interes legitim propriu sau în vederea îndeplinirii unei sarcini în interes public. Dacă nu aveți un interes legitim care să prevaleze asupra interesului persoanei vizate, trebuie să încetați prelucrarea datelor cu caracter personal.
De asemenea, o persoană poate solicita restricționarea prelucrării datelor sale cu caracter personal pe durata perioadei în care se stabilește dacă interesul companiei prevalează asupra interesului său.
**Dreptul la ștergerea datelor („dreptul de a fi uitat")**
În anumite situații, o persoană îi poate solicita operatorului de date să șteargă datele sale cu caracter personal, de exemplu dacă acestea nu mai sunt necesare pentru scopul prelucrării.
**Încălcări ale normelor și sancțiuni**
Nerespectarea RGPD poate duce la aplicarea de amenzi de până la 20 de milioane EUR sau 4 % din cifra de afaceri globală a companiei/organizatiei.

Pe cale de consecinta, va rog sa dispuneti de luarea masurii de interdictie a procesarii datelor cu caracter personal ale mele si stergerea articolelor referitoare la persoana mea si datelor mele personale.
In lumina celor mai sus expuse, solicit admiterea actiunii astfel cum aceasta a fost formulata, rugandu-va sa dispuneti in principal, **interdictia de folosire a datelor mele personale si publicare de articole care fac referire la**

16

numele/datele mele personale, de catre jurnalistul Paul Radu si a **publicatiilor/organizatiilor on line Organized and Corruption Reporting Project (OCCRP) si Rise Project Romania** si in subsidiar, folosirea datelor mele personale de catre oricare dintre jurnalistii publicatiilor/organizatiilor mentionate mai sus si stergerea articolelor referitoare la persoana mea din baza de articole a publicatiilor mai sus mentionate.

Sa dispuneti, **pe cale de ordonanta presedintiala**, fara citarea partilor, interdictia imediata a numitului Radu Paul, jurnalist, si **a publicatiilor/organizatiilor on line Organized and Corruption Reporting Project (OCCRP) si Rise Project Romania** de publicare a oricarui articol care face referire la numele meu, respectiv datetele mele personale si a coborarii/anularii/stergerii articolelor referotoare la persoana mea de pe platforma celor doua publicatii online, mai sus mentionate, pana la solutionarea definitiva a actiunii in cauza si obligarea paratilor la plata cheltuielilor de judecata, **pana la solutionarea definitiva a plangerii penale si a actiunii in cauza**.

Probe. In sustinerea celor mai sus expuse , solicitam administrarea probei cu inscrisuri.

Solicitam judecarea cauzei si in lipsa partilor legal citate.

Reclamant,
**Benyamin Steinmetz prin avocat desemnat,**



... this is the original signature of

CHITA NICOLITA

advocate, member of the Athens Bar Association,

registration number 34809

Athens, 21 - 2 - 2023

The President of the Athens Bar Association

DIMITRIS K. VERVESOS

# Exhibit 2

To:

ROMANIA
BUCHAREST COURT
37 Unirii Boulevard, Bucharest 030823, Romania
Telephone (central): 021.408.36.00; 021.408.37.00
Telephone number of the president: 021.3 I 8.77.00
THE PRESIDENT OF THE COURT OF BUCHAREST,

**- banning the usage of name on the Internet-**

**The undersigned:**

Benyamin Steinmetz of Rubin born in Israel on 02.04.1956, Israeli and French citizen, Israeli passport holder with no. 39032353 issued on 04/04/2022 by the Passport Service and valid until 04/03/2032, issued by the Jerusalem Passport and French passport number l8FVI0326 issued on 23.01.2019 by the Consulate General of France in Tel Aviv and valid until the date of 22.01.2029, conventionally represented by Lawyer Niculita Ghita, member of Bar Association of Athens, registration number 00034809, with headquarters procedural chosen at the Niculita Ghita Law Firm, from Athens, str Amfikleias 33, C.P. 11476, Hellenic Republic, email: niculinaghita@gmail.com with the chosen address at the headquarters of the law firm mentioned above,

**Against the Defendants**

1. **Paul Radu, investigative journalist from Bucharest**, cofounder of OCCRP and founder of RISE Project ( online publications)
   www.riseproject.ro,www.reportingproject.net,
   www.investigativedashboard.org

2. **OCCRP**, www.occrp.org, contact email: info@occrp.org
3. **Rise Project Romania**
   www.riseproject.ro,contact@riseproject.ro,
   https://www.facebook.com/riseproject.ro

**Request for judicial proceedings:**

1. mainly to ban the use of my data and publication of articles that refer to my name/data by journalist Paul Radu and online publications/organizations Organized and Corruption Reporting Project (OCCRP) and Rise Project Romania, publications with online activity, without contact address.

2. alternatively, the use of my data by any of the journalists of the publications/organizations mentioned above and the deletion
articles about me from the article base of the publications
Abovementioned.

3. To order, by way of presidential ordinance, without summoning the parties, the immediate ban of the said Radu Paul, journalist, and the online publications/organizations Organized and Corruption Reporting Project (OCCRP) and Rise Project Romania to publish any article which refers to my name, respectively my data and a downgrade/cancellation/deletions of articles published by the two online publications mentioned above, until  a definitive resolution of the action in question is issued.

4. obliging the defendants to pay court costs.

**MOTIFS**

Journalist Paul Radu and the online publications/organizations Organized and Corruption Reporting Project (OCCRP) and Rise Project Romania have been publishing and referring to my personal data, including my name, for at least ten years (10),  denigrating and slandering my person.

Radu Paul represents these publications/organizations mentioned above, being communities of journalists, activists and programmers who are investigating organized crime and corruption affecting Romania and the countries in the region.

As an example, I present to you some articles that appeared online and which have had the sole scope of my slander and defamation, destabilization, and distruction of my personality in the business world, nationally ( in Romania) and internationally  (EU and outside EU)

Articles published by www.riseproject.ro
https://www.riseproject.ro/?s=steinmetz&tztc=1

*Article from 05.04.2016*
https://www.riseproject.ro/articol/secretele-lui-steinmetz-ii-padurea-din-snagov-ascunsa-in-panama/

*Article from 04.04.2016*
https://www.riseproject.ro/articol/secretele-lui-steinmetz-i/

*Article from 21.06.2018*
*https://www.riseproject.ro/articol/retetele-financiare-ale-miliardarului-de-la-rosia-montana-panamapapers2/*

*Articles published by www.occrp.org*

1. *https://www.occrp.org/en/daily/13599-switzerland-billionaire-beny-steinmetz-goes-on-trial-for-bribery*
2. *https://www.occrp.org/en/daily/16714-mining-billionaire-and-partners-testify-in-landmark-swiss-bribery-case*
3. *https://www.occrp.org/en/daily/15632-beny-steinmentz-arrested-in-greece*
4. *https://www.occrp.org/en/daily/16354-france-billionaire-beny-steinmetz-loses-landmark-guinea-bribery-case*
5. *https://www.occrp.org/en/daily/13712-swiss-court-sends-beny-steinmetz-to-prison-for-bribery-in-guinea*
6. *https://www.occrp.org/en/daily/13646-swiss-prosecutors-seek-5-years-for-billionaire-beny-steinmetz*

These are some examples of the *"obsession"* that Radu Paul and the online publications/organizations Organized and Corruption Reporting Project (OCCRP) and Rise Project Romania have regarding my person before a final court decision.

I mention that against the criminal sentence no 39/F from 27.06.2019, by which I was sentenced to 5 (five) prison years for the constitution of an organized criminal group and for which I appealed, but remained final, I addressed the European Court of Human Rights, and the case has not been judged. This fact is not mentioned in any article.

The articles posted by the journalist Radu Paul and the online publications mentioned above raise many questions regarding their independence and their will to report the matters related to me correctly and fairly.

Indeed, the nature of the accusations, the way their questions are worded, and the short time allotted for the answer show an obsession with me similar to the one George Soros showed. His organization (Radu Paul) is funded mainly by Mr. Soros, and his foundations, which materially affects the investigation.

Therefore, even though I requested countless times (by email) to detail all his connections and the organizations he led with Mr. Soros, including all the financing offered, I never received an answer, and I am convinced even the Romanian state does not know the source of funding for the online platforms. To ensure transparency and correct reporting, I requested that all these links appear visibly in any of Radu's publications, but this never happened.

In addition, I was reliably informed that a reporter who closely cooperates with Paul Radu  and due to different opinions related to the articles that refer to my personal data has been determined to leave the NGO funded by Soros under severe corruption suspicions.

I want to point out that most of the accusations published by journalist Paul Radu and by the organizations mentioned above come from documents from various procedures globally. In short:

Vale -Vale's charges against Mr. Steinmetz were dismissed with prejudice by the High Court in London in February 2022.

Condemnation of Romania: As you well know, this decision was considered seriously flawed and likely to have come from political considerations, both by Interpol and by the Court of Appeal in Athens, which rejected the execution of requests for extradition and arrest. The accusations and the arrest were published online, and the rejection and the granting of damages as well as the rejection of the demand for extradition and arrest were not mentioned
ever.

IMR/Cunico - IMR disputes (which are themselves subject to corruption investigations)
made a series of allegations against BSGR and me in a complex shareholder dispute regarding Cunico. All these baseless accusations were now
withdrawn. This was never mentioned in online publications.

Gabriel Resources - My person has nothing to do with this company or with her litigation. BSG Capital Markets, in which I have no involvement or control, was acquired in 2009, now representing less than 9% of Gabriel Resources.

I firmly reject any statement concerning
my participation in an activity (legal or otherwise) relating to Gabriel Resources, and there is no legal action taken against me concerning this issue.

Guinea: The Republic of Guinea raised a series of accusations against me.
The ICSID Tribunal issued a ruling last summer that is currently the subject of a cancellation request. This is also not mentioned in the articles in question.

George Soros
BSGR claim against Mr. Soros . He accused me that, through BSGR, I dared to file a claim against their significant financier (paragraphs 16, 36, 37, and 50). I also request now to entirely mention all their connections with Mr. Soros, and his organizations.

Indeed, it is quite remarkable that these accusations, while Mr. Soros and his organization are one of the primary beneficiaries of the organization led by Paul Radu.

We trust that this conflict of interest and lack of independence will be prominently disclosed in any of the online publications about me and,
thus, in the interest of transparency and correct reporting, whose defenders they present themselves.

Against BSGR. Article was reproduced by the journalist Radu Paul through his organizations in the online environment. Vale brought a conspiracy claim against other co-defendants and me in the Commercial Courts in London. After a lengthy procedure of only two years, four weeks into an eleven-week trial.
Vale's claim against other co-defendants and me regarding the same facts upon which LCIA Court ruled was rejected with prejudice by the High Court of London in February 2022. A fact that was not mentioned in the concerned online publications

In various proceedings against BSGR, me, and other entities, Vale characterized GSOL and those mentioned above as "agents and nominated" for BSGR or about me. These claims have been denied with firmness by all against whom they were made, and those statements have never been the subject of a legal decision. The articles never mentioned it.

I, as a result, specify that neither GSOL nor Sabby Mionis, Marcos Camhis, or Ioannis Procopis have acted as agents or nominees in any transaction that the articles refer to or in any other circumstances.

Mr. Sabby Mionis is himself a very successful businessman. As a matter of clarification, Koidu is not in the hands of GSOL, it is fully owned by Octea, which BSGR wholly owns. Allegations that were made in the proceedings were dismissed with prejudice.

Romania
Romanian criminal procedure

The charges in paragraphs 9 to 12 come from the criminal case in Romania against other co-defendants and me.

In 2019, after a three-year trial, I was fully acquitted by the Braşov court. The judge issued a decision of over 300 pages detailing the reasons for my acquittal.

The prosecutors immediately appealed against this decision, and three judges were appointed, renowned for their high conviction rate and publicly referred to as "The Dark Judges Panel"

A complete retrial occurred in 2020 before the High Court of Justice in Bucharest. This second instance was highly politically motivated, and the proceedings were full of irregularities, including illegal wiretapping and partial translations.

On December 17, 2020, the judges sentenced my co-defendants, including a lawyer and me, to prison.

This lawyer, Robert Rosu, was finally acquitted after a year behind bars.

In October 2021, Interpol canceled the arrest warrant that was issued, at the request of the Romanian authorities, against me. Obviously, this aspect was never mentioned in the online publications in question.

The Interpol Commission decided that the Romanian procedure conducted against me was seriously flawed and probably stemmed from political considerations. Similarly, the Athens Court of Appeal canceled Romania's extradition request for the same reasons. Other European countries shared the same position. These were not the subject of articles in the online publications in question. We also filed an appeal with the European Court of Human Rights in October 2021, citing violations of Article 6(I) ECHR (lack of fairness, lack of proper administration of evidence, lack of independence/impartiality) and Article 6. (3) ) ECHR (refusal to consider defense evidence, refusal to disclose evidence of potential lack of independence, violation of the right to a lawyer of one's choice, violation of the right to cross-examine witnesses and substitution of charges). These proceedings are still pending. For the cleanliness of the information, these aspects should have been mentioned in the online publications in question.

Gabriel Resources / Rosia Montana

They also posted various accusations about Gabriel Resources through their articles (paragraphs 22, 23, and 47). I had absolutely nothing to do with this project nor with the related ICSID procedures.

Finally, I continue to deny that the President of Romania ever summoned, in his presence, the Minister of Mines to grant BSGR any exploitation rights. As discussed above, this allegation was made by a state witness who received payments from Guinean representatives before testifying. There are even indications that some of these funds came from parties affiliated with Soros. Their lies about me were discovered during the court proceedings.

The posted articles claimed that I made a declaration on my responsibility in April 2013 (paragraph 8). This is untrue. I have never made this affidavit.

Guinea

The online articles made several accusations regarding my supposed interest in Niron (points 13, 18, and 46).

In 2019, I was not an advisor to BSGR. At that time, BSGR was under a Court-appointed administration.

It is public information that I attended the negotiations of a provisional agreement between the BSGR and the Republic of Guinea. The terms of this agreement were never finalized. Contrary to their claims, Nimba is not part of this agreement. I repeat for the record that Mr. Mionis, Mr. Camhis and Mr. Procopis, or any company referred to, have never acted as agents for me or any of the related companies I have never had any interest, directly or indirectly, in GSOL or in any of its subsidiaries, including Niron. I have never been the effective owner of Niron, nor of any of the Companies under the foundations of which I am one of the beneficiaries.

in any case.

The Republic of Guinea has not awaited any Award or decision by the ICSID Tribunal to award Simandou Blocks 1 and 2 to a third party that effectively controls the entire Simandou Range. Conde (still backed by Soros) essentially awarded an asset (BSGR/Vale JV had spent more than 1.2 billion on) to a third party without any tender. We mention that the organizations in question, by chance or not, have yet to investigate this subsequent attribution of mining rights and never referred to this aspect in the online environment. Just letting it be understood that my urn is involved in this aspect.

I was offered, under competitive conditions, options in Niron to be exercised after a transaction, but a transaction has yet to take place.

ICSID procedure

The organizations in question published a series of allegations regarding BSGR's investment treaty claim against the Republic of Guinea (paragraphs 2, 21, and 48).

It is absurd to claim that the BSGR made an ICSID claim only to pressure Guinea into an agreement. BSGR filed a bona fide ICSED lawsuit against Guinea for damages to compensate for the illegal expropriation of its mining rights and associated investments in Guinea.

The Tribunal failed to rule on the abundant and convincing evidence of the corrupt motives of the Government of Guinea to revoke the mining rights of BSGR. This TCSID decision is currently subject to annulment proceedings.

As a matter of clarification, BSGR has never made any ICSED claim against Romania. It is unclear what "countries such as Romania or Guinea" means. BSGR is undoubtedly not the only investor to file ICSED claims against the Republic of Guinea, and Romania is the subject of dozens or more ICSED lawsuits. Both countries have lost many arbitration proceedings that ruled on their illegal practices.

Valle

Online allegations in paragraphs 13, 14, 17, 42, and 45 were made by Vale.

Balda Foundation, whose beneficiary I am, owns, through BSG Capital Markets, a minority stake (under 9%) in Gabriel Resources, the owner of the Romanian mining rights in Roşia Montană. As an interested party, the Balda Foundation will benefit from a favorable ICISD award to Gabriel Resources if such an award positively affects its share price.

It is not clear why he was accusing me of the other shareholders of Gabriel Resources, namely Tenor Fund. I do not know about the financing of this ICSID arbitration request against Romania and whether it has anything to do with Tenor Capital. I have not made any investment in Tenor Capital and I have not even met with any of its representatives. This is another entirely made-up story.

In addition, regarding my meeting with Mr. Tăriceanu in Israel, I had, at that time, several investments in Romania. Roşia Montana was not discussed. The insinuations made in the articles regarding wrongdoings are firmly denied.

Sierra Leone

They also made a number of allegations about the Koidu diamond mine in paragraphs 24 to 31. All claims of wrongdoing are strongly denied.

I emphasize that I am not involved in the management of Koidu. Koidu is owned by Octea, which is itself a subsidiary of BSG Resources. As is well known, BSG Resources is under court-appointed administration.

They claimed that several Octea executives were asked to submit affidavits regarding my role. I have no knowledge about this, and from the articles posted online, I feel that more details should be provided.

As far as I know about this project, Octea/Koidu is an example of a well-organized project that respects the best practices in the mining industry in Sierra Leone and Africa.

Macedonia

They posted additional allegations about me and BGSR and our involvement in FENI Industries in Macedonia (paragraphs 15, 32, 33, 34, and 35):

I deny any connection between these accusations.

All the accusations published online were made during a legal dispute between BSGR and its former partner, IMR. This dispute has been resolved, and all unfounded allegations have been withdrawn. The online articles do not refer to the withdrawn charges.

GSQL

They made quite serious allegations about my connections with GSOL and its directors (paragraphs 13, 19, 20, 43 and 44):

The posted article claims that I would have some degree of control or influence over GSOL's shares and would benefit from its assets (point 19) and asks in point 43 if I have any legal relationship with GSOL. I repeat once and for all that I have no control over GSOL; neither GSOL nor its affiliates are my agents or nominees, and there is no legal relationship between them.

As explained above, Vale is the one who claimed that GSOL and its directors were agents and nominees of mine. Vale's claims against me had no merit and were dismissed with damages by the High Court in London.

Their claim related to the purchase of Octea's debt, based on a statement made by an unidentified person from Standard Chartered Bank, is untrue. From the information held, all transactions related to the Octea debt were registered under competitive conditions.

From what has been shown, it results that the direct, unmistakable, unfounded, illegal and unfounded purpose of the journalist Radu Paul and the organizations with online publications is to follow my activity over time. The pursuit of publishing articles in the online environment that refer to me, using personal data mine, is to harm me, to affect my public image and to affect my business interests.

Legal motivation:

In essence, civil action is the set of procedural means provided by law for the protection of the subjective right claimed by one of the parties or of another legal situation, as well as for ensuring the defense of the parties in the process. Anyone who claims against another person or pursues a solution to a legal situation has the right to request the competent court (art. 30, par.l, C.Civ.).

The OCCRP organization, which carries out its activity in the online environment, on its website presents itself as working "with advocacy groups, arming civil society with information to exert significant pressure in favor of justice and change, and uncovering evidence that allows the bodies of law enforcement to act."

A statement that leaves something to be desired insults justice, the principle of independence of the justice system in Romania and anywhere in the world,

insinuates that justice in Romania, mainly, and in the world, in general, is applied only if there is significant pressure from it. It also indicates that the instruments available to a state of law adjacent to the justice system need to be more competent, and only through their contribution are pieces of evidence that allow these law enforcement bodies to act.

Regarding my person, I consider that the "insistence" and "consistency" of publishing articles that refer to my person and use my data has exceeded any limit. Exceeding the limit pertains to crimes against my honor and dignity and is legally included in the Criminal Code. More exactly in:

"He who in public by any means asserts about a person or imputes to him certain facts regarding his public life or activity, which, if true, would expose that person to criminal or disciplinary prosecution, or public contempt, commits the crime of slander against public life and is punishable by correctional prison from 3 months to one year and a fine from 2,000 to 5,000 lei" (art. 507)

"He who in public by any means asserts about a person or imputes to him certain facts regarding his private life, his professional activity, or his honor, which, if they were true, would expose that person to criminal or disciplinary proceedings, or public contempt, commits the crime of slander against private life and is punished with correctional prison from 6 months to 2 years and a fine from 2,000 to 8,000 lei." (art. 508) "Punishment of slander in the case of art. 507, is correctional prison from 6 months to one year and a fine from 2,000 to 5,000 lei, if the crime is committed:

1. against a body constituted in the State or against a public administration, or against an administration or enterprise, in which public interests are engaged, against a member thereof, or a civil servant;

2. through the press, through any means of broadcasting, or in public gatherings;

3. for vile reasons." (art. 509)

A

"If facts are asserted or spread, or imputations or assertions are made for which the law does not admit proof of truth, the fact constitutes the crime of defamation and is punished with correctional prison from 2 to 6 months and a fine from 2,000 to 3,000 lei** (art. 510).

"In case of slander or insult, the truth, imputation or statement can be proved in the following circumstances:

1. if the imputation or statement was made to protect or preserve a public interest or an essential and well-founded private interest.

Public interest means:

a) ensuring the best possible recruitment of the elements called to perform public functions or services;

b) compliance with laws, regulations, and ordinances;

c) prevention of abuses in public administrations;

d) the defense of the interests of a social class, of a confession recognized by the State or of a profession;

2. if the imputation or statement is the subject of an ongoing criminal or disciplinary action;

3. if the imputation or statement is found to be true by a court decision;

4. if the person slandered or insulted expressly requests that the truth be tested;

5. if the imputation or statement refers to the public life of an official or individual." (art. 514

"Truth test is prohibited, in any case, and even in the cases provided in art. 514

1. if the offended party is any of the persons shown in art. 205;

2. if the imputation or statement concerns a fact on which a "judicial or disciplinary court has pronounced acquittal or rehabilitation " (art. 515) "Evidence of the truth is admissible only on the condition that the imputation or statement, as well as the form in which they were made, were necessary to protect or preserve a public interest, in the following cases:

1. if the imputation or statement concerns the intimate life of a person or family, or the honor of my wife, as long as it is not a crime prosecuted ex officio;

2. if the imputation or statement refers to a crime that can only be traced to the prior complaint of the injured party, who did not file such a complaint, and the defendant knew this during the commission of the crime." (art. 516) "Criminal action for slander, defamation, and insult can be initiated only upon the prior complaint of the injured party." (art. 518).

Protection of data and private life in the online environment

EU rules guarantee that personal data is protected whenever there is a need to collect it.

These rules apply to both companies and organizations (public and private) in the EU and those outside the EU that offer goods or services in the EU.

Data protection rights must be respected regardless of how they are collected - online, in a computerized system, or on paper, in a structured file.

The EU rules on data protection, included in the so-called Regulation General EU data protection (RGPD), describe the various situations in which a company or organization has permission to collect or reuse your personal information. In any other case, the company or organization must ask for the agreement (consent) before managing or reusing personal data.

Deletion of personal data (right to be forgotten)

If the data is no longer needed or used illegally, it can be requested to delete it. It is about the so-called "right to be forgotten."

These rules also apply to search engines, such as Google, because they are also considered data operators. Website links containing the name may be requested to

be removed from search engines if the information is incorrect, inadequate, irrelevant, or excessive, as in the case mentioned.

Suppose a company has published personal data online, and its deletion has been requested. In that case, that company must inform any other sites on which the data has been published that its deletion and links to them have been requested.

**Agreement for data processing: consent**

If your data is stolen, lost, or illegally accessed - a so-called data security breach - the data operator (the person or body that processes the personal data) must report this to the national data protection authority. The data controller must also inform you directly if there are severe risks to your personal data and privacy as a result of a breach of the security of this data.

**Filing a complaint**

If data protection rights have been violated, a complaint can be made directly to the national data protection authority. It will investigate and give an answer within three months.

Another possibility is filing a legal action against the company or organization. Through this action, I reserve the right to receive compensation for material (financial loss) and non-material (psychological suffering) damages due to the journalist Radu Paul and the organizations in question because they do not comply with EU data protection rules.

https://eur-lex.euroDa.eu.1egal-content/RQ/TXT/?uri=CELEX:32016R0675

All this is derived from REGULATION (EU) 2016/679 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of April 27, 2016, on the protection of natural persons about the processing of personal data and on the free movement of such data and repealing the Directive 95/46/EC (General Data Protection Regulation)

**Data protection under the GDPR**

GDPR sets out detailed requirements for companies and organizations regarding collecting, storing, and managing personal data. It applies both to European organizations that process the personal data of EU citizens and to non-EU organizations that target EU citizens.

GDPR applies if:

The company processes personal data and is based in the EU; regardless of the place where the actual data processing takes place, the company is based outside the EU but processes personal data in the context of the provision of goods or services to EU citizens or monitors the behavior of EU citizens.

Non-EU companies that process the personal data of European citizens must designate a representative in the EU. Personal data includes any information about

a person identified or identifiable (data subject). Among character data personnel includes:

NAMEs

Address

ID card/passport number income

cultural profile

Internet Protocol (IP) address

data held by doctors or hospitals (which identifies a person for medical purposes)

Special categories of data You may not process data relating to racial or ethnic origin sexual orientation

political opinions

religious or philosophical beliefs, trade union membership

■ genetic, biometric or medical data, except for specific cases (for example, when the person has given explicit consent or when the processing f - is necessary for reasons related to a significant public interest, defined by European or national legislation)

personal data relating to criminal offenses or convictions, unless this is authorized by national or European law

During processing, personal data may reach several companies or organizations. In this process, two important entities appear: the data operator - decides for what purpose the personal data will be processed

the person authorized by the data controller - holds and processes data on behalf of the data controller

The company/organization has an obligation to appoint a data protection officer when:

monitor citizens periodically or systematically or process special categories of data

The data protection officer can be a member of the organization or a person contracted externally based on a service contact. It can also be part of an organization, not necessarily a person.

Transfer of data outside the EU

When personal data is transferred outside the EU, the protection provided by the GDPR should "travel" with it. This means that if data is exported abroad, the company/organization must ensure that at least one of the following provisions is put in place enforcement: the protection provided by the non-EU country is considered adequate by the EU, the company/organization takes the necessary steps to provide adequate protection, for example by including specific clauses in the contract agreed with the non-EU data importer

the company relies on particular exemptions that allow the transfer, such as the individual's consent

According to EU data protection rules, data should be processed fairly and legally for a specific and legitimate purpose, and only those data that are necessary to fulfill that purpose. In order to process personal data, one of the following conditions must be met: consent of the data subject, need for personal data to fulfill a contractual obligation towards the person in question, need for personal data to fulfill a legal obligation, need for personal data for to protect the vital interests of the data subject, process personal data to perform a task in the public interest, to act in the legitimate interest of the company, as long as the fundamental rights and freedoms of the persons whose data are processed are not seriously affected.

If the rights of the person prevail over the interests of the company, personal data can be processed first.

Consent to data processing: GDPR consent provides strict rules for data processing based on consent. The purpose of these rules is to ensure that the data subject understands what they are consenting to. Therefore, permission must be given freely, expressly informed, and unambiguous, using a request presented in clear and straightforward language.

The right to correct data and the right to object If a person considers that their personal data is incorrect, incomplete or inaccurate, that person has the right to correct or complete it without delay.

In this case, you must inform all recipients of the data if part of the data you shared with them has been modified or deleted. If some of the shared data turns out to be incorrect, you must inform everyone who viewed it (unless doing so would involve a disproportionate effort).

A person can object at any time to the processing of his personal data, when the company processes said data based on a legitimate interest of its own or in order to fulfill a task in the public interest. If you do not have a legitimate interest that prevails over the interest of the data subject, you must stop processing personal data.

Also, a person can request the restriction of the processing of his personal data during the period in which it is determined whether the company's interest prevails over his interest.

The right to data deletion (the "right to be forgotten")
In certain situations, a person can ask the data operator to delete
his personal data, for example, if it is no longer needed
for the purpose of processing.

**Violations of the rules and sanctions**

Failure to comply with the GDPR can result in fines of up to EUR 20 million or 4% of the company/organization's global turnover.

As a consequence, please order the prohibition of the processing of my personal data and the deletion of the articles related to my person and my personal data.

In light of the above, I request the admission of the action as it was formulated, asking you to order, in the main, the ban on the use of my personal data and the publication of articles that refer to name/personal data, by the journalist Paul Radu and of the online publications/organizations Organized and Corruption Reporting Project (OCCRP) and Rise Project Romania and, as a subsidiary, the use of my personal data by any of the journalists of the publications/organizations mentioned above and deleting the articles about me from the article base of the aforementioned publications.

To dispose of through the presidential ordinance, without citing the parties, the immediate prohibition of the said Radu Paul, journalist, and of the online publications/organizations Organized and Corruption Reporting Project (OCCRP) and Rise Project Romania from publishing any article that refers to my name, respectively my personal data and taking down/canceling/deleting the articles referring to me from the platform of the two online publications, mentioned above, until the definitive settlement of the action in question and the obliging of the defendants to pay court costs, until a final court decision is taken in action in question.

Samples. In support of the above, we request the administration of evidence with inscriptions.

We request the trial of the case even in the absence of the legally cited parties.

Plaintiff,

# Exhibit 3



Mr Paul Radu
Organized Crime and Corruption Reporting Project

**By email:** paul@occrp.org

4 April 2023

Dear Mr Radu,

**URGENT**

**Potential publications about Benjamin Steinmetz by Paul Radu and Organized Crime and Corruption Reporting Project ("OCCRP")**

We act for Benjamin Steinmetz.

Mr Steinmetz has provided us with copies of your recent correspondence with him and his Israeli attorney regarding articles which OCCRP is preparing to publish about him. As stated in prior correspondence, it is evident from the statements upon which you asked our client to comment that your analysis is flawed and in many cases based upon inaccuracies. For example, many of the allegations upon which you invited Mr Steinmetz to comment were made by Vale SA in its claim against Mr Steinmetz in the English High Court but, as you know, that claim was dismissed in early 2022 by the Court on its merits.

Notwithstanding our client's position set out in previous correspondence that the allegations you make against him are false and factually incorrect, we understand that you still intend on publishing a series of stories including some or all of those allegations.

Please treat this letter as formal notice that should you publish any defamatory statements regarding our client, our client reserves his right to take any steps necessary to protect himself, including taking court action against OCCRP and/or you personally for defamation, and including the right to seek injunctive relief to prevent publication.

In the regrettable event that our client does need to commence court proceedings, he will be seeking significant damages as well as the full costs of those proceedings from you.

Yours faithfully,

Asserson Law Offices

ASSERSON LAW OFFICES

**London**   **Tel Aviv**

Central Court, 25 Southampton Buildings, Holborn, London, WC2A 1AL   132 Menachem Begin, Azrieli Center 5
**Postal and Administration address:** Churchill House, 137-139 Brent Street, London, NW4 4DJ   Square Tower, Floor 28, Tel Aviv, 6702501
+44 (0)207 173 1920   +972 (0)3 744 9191

**Asserson Law Offices** is authorised and regulated by the Solicitors Regulation Authority (Number 549779)   **www.asserson.co.uk**